## NORTHERN PACIFIC RAILROAD COMPANY *v.* SANDERS.

### ERROR TO THE COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 12. Argued March 12, 1897. — Decided April 19, 1897.

Lands were expressly excepted from the grant made in 1864 for the benefit of the Northern Pacific Railroad, which were not free from preëmption "or other claims or rights" at the time the line of the road was definitely fixed and a plat thereof filed in the office of the Commissioner of the General Land Office. The general route of the railroad was fixed February 21, 1872, and its line of definite location on the 6th of July, 1882. After the company filed a map of general route, the Commissioner of the General Land Office, under the directions of the Secretary of the Interior, April 22, 1872, transmitted a diagram of that route to the register and receiver of the land office at Helena, Montana, with a letter of instructions directing the withdrawal from sale or location, preëmption or homestead entry, all the surveyed and unsurveyed odd-numbered sections of public lands falling within the limits of forty miles as designated on that map. The lands in dispute are within the exterior lines of both the general and definite routes of the railroad. Prior to such definite location certain persons, qualified to purchase mineral lands under the laws of the United States, entered upon the possession of

these lands, and did " file upon " them " as mineral lands," applying for patents, and conforming in all respects to the provisions of Chapter 6 of the Revised Statutes of the United States, Title XXXII, relating to " Mineral Lands and Mining Resources." The company filed a protest against the perfection of any entry of the lands as mineral lands upon the ground that they were not mineral lands nor commercially valuable for any gold or other precious metals therein contained. At the time of the definite location of the Northern Pacific Railroad and of the filing of the plat and map thereof in the General Land Office, the applications for these lands as mineral lands were pending and undetermined, the applicants claiming, before the proper office, that they were mineral lands of the United States to which they were entitled under their respective applications, and not lands in quality such as was described in the grant to the Northern Pacific Railroad Company. On the 4th day of August, 1887, the company presented to the register and receiver of the proper land office for approval, a list of lands selected by it as having been granted by the act of Congress, to the end that such lands (the list including the lands here in dispute) might be patented to it; but that officer refused to approve such list because of the existence, on the 6th day of July, 1882, of the above claims to the lands as mineral lands. It did not appear from the record what became of the several applications set out in the answer to purchase these lands as mineral lands, nor whether the railroad company appealed from the decision made in 1887 by the local land office at Helena refusing to approve the list presented of lands claimed by it under the act of Congress. *Held,* That the above applications were " claims" within the meaning of the act of July 2, 1864, granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route, and excepting therefrom lands not " free from preemption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office"; consequently, the lands embraced by those applications did not pass to the railroad company under the grant made by the above act.

THE case is stated in the opinion.

*Mr. A. B. Browne* for plaintiff in error. *Mr. A. T. Britton* was on his brief.

*Mr. John C. Spooner* and *Mr. C. W. Bunn* filed a brief for plaintiff in error.

*Mr. W. F. Sanders* and *Mr. S. S. Burdett* for defendants in error.

*Mr. Solicitor General* filed a brief on behalf of the United States.

Mr. Justice Harlan delivered the opinion of the court.

This action was brought by the Northern Pacific Railroad Company to recover from the defendants in error, the original defendants, the possession of section twenty-one, township ten north of range three west in the county of Lewis and Clarke in the State of Montana.

The railroad company claims title under the act of Congress of July 2, 1864, 13 Stat. 365, c. 217, granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast, by the northern route.

The defendants do not assert title in themselves, but resist the claim of the railroad company upon the ground that, at the time of the definite location of the Northern Pacific Railroad and of the filing of the plat thereof in the office of the Commissioner of the General Land Office, such "claims" were made of record upon the lands in dispute as excluded them from the grant to the Northern Pacific Railroad Company.

Congress granted to the Northern Pacific Railroad Company every alternate section of public land, "not mineral," designated by odd numbers, to the amount of twenty alternate sections per mile on each side of the railroad line, as the company might adopt, through the Territories of the United States, and ten alternate sections per mile on each side of the railroad whenever it passed through any State, "and whenever on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and *free* from preemption, *or other claims* or rights *at the time the line of said road is definitely fixed*, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or preempted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under

the direction of the Secretary of the Interior, in alternate sections and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections. . . . *Provided further*, That all mineral lands be, and the same are hereby, excluded from the operations of this act, and in lieu thereof a like quantity of unoccupied and unappropriated agricultural lands, in odd-numbered sections, nearest to the line of said road may be selected as above provided: *And provided further*, That the word 'mineral,' when it occurs in this act, shall not be held to include iron and coal." § 3.

The sixth section directed the lands to be surveyed for forty miles in width on both sides of the entire line of the road after the general route was fixed and as fast as was required by the construction of the railroad, and provided that "the odd sections of land, hereby granted shall not be liable to sale, or entry or preëmption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale." § 6.

The amended complaint alleged that the railroad company duly accepted the terms and conditions of the act of Congress; that the general route of the railroad extending through the State of Montana was duly fixed February 21, 1872; that the land in dispute was on and within forty miles of such general route, and at that date was "public land to which the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights"; that at the date of the passage of the act of 1864, as well as when said general route was fixed, no part of the land in controversy was "known mineral land," and

" was not mineral land, nor was any part of said last-described land within any exceptions from said grant "; that on July 6, 1882, the railroad company definitely fixed the line of its railroad, extending opposite to and past said section 21, township 10 north, range 3 west, and filed a plat thereof in the office of the Commissioner of the General Land Office; that "said land is on and within forty miles of said line of railroad so definitely fixed "; that thereafter the company duly constructed and completed that portion of its railroad and telegraph line extending over and along its line of definite location, whereupon the President of the United States appointed three commissioners to examine the same, who reported that that portion of the line had been completed in a good, substantial and workmanlike manner ; that the President of the United States duly accepted said line of road and telegraph so constructed and completed ; that at the date of so definitely locating the line of railroad, and at the time of the filing of the plat thereof in the office of the Commissioner of the General Land Office, as above stated, the land in dispute was " not known " to be mineral land, but was agricultural land to which "the United States had full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights.

The defendants, in their answer, " *confessing* that said premises did not contain gold or other precious metals in paying quantities or in such quantity as to make the same, or any part thereof, commercially valuable therefor, nevertheless say, *as to the northeast quarter of section* 21, that heretofore, to wit, on the second day of August, 1880, Theodore H. Kleinschmidt, Edward W. Knight, Henry M. Parchen, Charles K. Wells, George P. Reeves, David H. Cuthbert, Cornelius Hedges and Stephen E. Atkinson, each being then and there a citizen of the United States, and each having theretofore filed upon a certain separate twenty acres on the northeast quarter of said section according to the laws of the Territory of Montana, and the mining usages and customs then in force in the unorganized mining district in which said land was situated, and being then in all respects qualified to enter mineral land under

the laws of the United States, did enter into the possession of, and did enter in the United States land office, and did file. upon the said quarter of said section in the land office of the United States, at Helena, Montana, in which district said land was situate, as mineral land, and did apply for a patent therefor, and did then and there and in due form file an application to purchase said premises as such mineral land, and did then and there make oath before the register and receiver of said land office that they had discovered mineral thereon and had located the said quarter section as mineral land and claimed the same as such for the valuable mineral deposits therein, and that they had complied with chapter 6 of title XXXII of the Revised Statutes of the United States, which said application was so filed in the land office at Helena, Montana, under the oath of the said applicants, showing that they had complied with the law aforesaid, and describing the same by legal subdivisions, and they did then and there prior to filing said application post in a conspicuous place, on the claim embraced therein, a copy of said application and notice hereinafter mentioned, which said notice did then and there remain conspicuously posted, on said premises during the period of publication hereafter mentioned, and they did then and there file with their said application in said land office, an affidavit of two persons that such notice had been so duly posted, and did then and there file a copy of said notice in the land office with the register and receiver thereof, and by said application they requested to be permitted to purchase the same as mineral land, and they then and there undertook and offered to maintain by proof that the said premises were valuable for the gold contained therein and were mineral lands of the United States, to which they were entitled under the laws thereof, and that they had done the requisite amount of work thereon, to wit, work of the value of five hundred dollars, and were entitled to a patent therefor, which said application and affidavit and notice were then and there entered of record in said United States land office by the register and receiver thereof, and the said application was set for a hearing upon their said proofs to be produced, and notice of such hearing in

due form of law was given by the register and receiver in the proper newspaper designated for that purpose, and was duly published therein, which said entry, application, affidavits and notice were in all respects formal according to law, and the said application was set down for a hearing in said land office by the register and receiver thereof at the expiration of the period of time prescribed in said notice and at the date at which the same was so set, the said plaintiff having theretofore filed a protest against the perfection of the said entry, for the reason, as claimed by said plaintiff, that the same were not mineral land or commercially valuable for the gold or other precious metals therein contained; that said application was continued thereafter by the consent of parties or otherwise, from time to time, and was asserted and remained pending on the 6th day of July, 1882, and thereafter the said applicants on the 6th day of July, 1882, and thereafter as theretofore, averring their ability to prove that the said land was commercially valuable for the gold therein contained, and was mineral land within the definition of that phrase contained in the act granting lands to said plaintiff mentioned in said amended complaint, and the said applicants were on the date last aforesaid claiming, affirming and undertaking to maintain on their application for said premises in said land office, that the same was mineral land of the United States, to which they were entitled thereunder, and was not land in quality such as was described in the grant to the said plaintiff."

The answer alleged like filings, applications, etc., under the mining laws of the United States, as follows: By George P. Reeves, Helen H. Reeves, Laura C. Ballou, John W. Eddy, Evelyn M. Eddy, Edward W. Knight, Theodosia M. Knight and Anna Natolia King, August 12, 1880, upon twenty acres in the *northwest quarter* of said section 21; by Theodore Kleinschmidt, Henry M. Parchen, David H. Cuthbert, Stephen E. Atkinson, Lucius I. Rosecrans, Emma M. Parchen, Mary M. Kleinschmidt and Annie E. Cuthbert, February 19, 1881, upon twenty acres in the *southwest quarter* of the same section; and by Cornelius Hedges, Thomas A. H. Hay, Mary L. Guthrie, Patrick Quinn, Louis A. Walker, William D. Wheeler, Edna L.

Hedges and George E. Carpenter, March 13, 1880, upon twenty acres of the *southeast quarter* of the same section.

Referring to the proceedings in the office of the county clerk and recorder of the county of Lewis and Clarke, Montana, in which county the premises are situate, and in the United States land office at Helena, the answer stated that they were in the form prescribed by law for the claim and entry of placer mining claims, and that thereafter, on the 4th day of August, 1887, the plaintiff presented to the said register and receiver a list of lands selected by it as having been granted by the act aforementioned, " to be approved to the end that the said premises in said list described might [be] certified to it for patent, which list includes said section twenty-one, but to approve said list or certify said lands to said company the said register and receiver and the Land Department of the United States refused because of the existence on the 6th day of July, 1882, of the foregoing claims to the same as mineral lands"; that on the 21st day of February, 1872, the plaintiff filed a map of the general route of its road in the office of the Commissioner of the General Land Office; that thereafter the Commissioner, under the directions of the Secretary of the Interior, duly prepared a plat showing that portion of the preliminary or general route of the Northern Pacific Railroad extending through the United States land district of Helena, and designated thereon lines showing the limits of the land grant to the plaintiff, for forty miles in width on each side of said line of general route; that on April 22, 1872, the Commissioner of the General Land Office, under the directions of the Secretary of the Interior, duly transmitted said diagram to the register and receiver of the United States district land office at Helena, with instructions " to withdraw from sale or location, preëmption or homestead entry, all the surveyed and unsurveyed odd-numbered sections of public lands falling within the limits of forty miles, as designated on this map"; and that the said letter of instructions and diagram were received at the United States district land office at Helena, May 6, 1872.

The plaintiff demurred to the answer and the demurrer

was overruled. 46 Fed. Rep. 239. A rehearing having been granted, and the cause finally heard upon the amended complaint, the answer and the demurrer to the answer, a judgment was rendered for the defendants. 47 Fed. Rep. 604. That judgment was affirmed in the Circuit Court of Appeals. 7 U. S. App. 47.

It appears from the above statement of the case :

That lands were expressly excepted from the grant made for the benefit of the Northern Pacific Railroad that were not free from preëmption " or other claims or rights " at the time the line of the road was definitely fixed and a plat thereof filed in the office of the Commissioner of the General Land Office ;

That the general route of the Northern Pacific Railroad was fixed February 21, 1872, and its line of definite location was established and a plat thereof filed on the 6th day of July, 1882 ;

That after the railroad company filed its map of general route showing the limits of such route for forty miles in width on each side of its line, the Commissioner of the General Land Office, under the directions of the Secretary of the Interior, April 22, 1872, transmitted a diagram of such route to the register and receiver of the land office at Helena, Montana, with a letter of instructions, directing the withdrawal from sale or location, preëmption or homestead entry, of all the surveyed. and unsurveyed odd-numbered sections of public lands falling within the limits of forty miles as designated on that map ;

That the lands in dispute are within the exterior lines of both the general and definite routes of the railroad ;

That prior to such definite location certain persons, qualified to enter mineral lands under the laws of the United States, entered upon the possession of the lands in dispute, and did " file upon " them " as mineral lands," applying for patents therefor, and conforming in all respects to the provisions of Chapter 6 of the Revised Statutes of the United States, Title XXXII, relating to " Mineral Lands and Mining Resources " ;

That the railroad company filed in the proper office a protest against the perfection of any entry of these lands as

mineral lands upon the ground that they were not mineral lands nor commercially valuable for any gold or other precious metals therein contained;

That at the time of the definite location of the Northern Pacific Railroad, and of the filing of the plat and map thereof in the General Land Office, on the 6th day of July, 1882, the applications for these lands as mineral lands were pending and undetermined, the applicants claiming, affirming and undertaking to maintain before the proper office, that they were mineral lands of the United States to which they were entitled under their respective applications, and not lands in quality such as were described in the grant to the Northern Pacific Railroad Company; and,

That on the 4th day of August, 1887, the railroad company presented to the register and receiver of the proper land office, for approval, a list of lands selected under the above act of Congress, to the end that they might be patented to it; but that officer refused to approve such list (which included the lands here in dispute) because of the existence, on the 6th day of July, 1882, of the above claims to the lands as mineral lands.

It does not appear from the record what became of the several applications set out in the answer to purchase these lands as mineral lands, nor whether the railroad company appealed from the decision made in 1887 by the local land office at Helena refusing to approve the list presented of lands claimed by it under the act of Congress.

We have seen that the act of July 2, 1864, under which the railroad company claims title, excluded from the grant made by it all lands that were not, *at the time the line of the road was definitely fixed*, free from preëmption *"or other claims or rights"*; and the demurrer to the answer admits that at that time there were claims pending in the land office, unde-termined, to purchase these lands as mineral lands, and such applications conformed in all respects to the laws of the United States then in force relating to mineral lands.

But it is said that no account is to be taken of those appli-cations, for the reason that the present defendants, who had

nothing to do with them, and had no interest in them, confess, in their answer, that the lands in question "did not contain gold or other precious metals in paying quantities or in such quantity as to make the same, or any part thereof, commercially valuable therefor"; that the lands are, therefore, to be regarded as agricultural lands that passed to the company under the act of 1864, and were preserved to it by the filing of the map of the general route in 1872 and by their withdrawal in that year by the General Land Office "from sale or location, preëmption or homestead entry." This view overlooks the fact that the express declaration of Congress was that no public lands should pass to the company to which, at the time of the definite location of the road, the United States did not have title free from preëmption "or other claims or rights." If the applications made in 1880 and 1881, to purchase different parts of the section in question, and which were pending and undisposed of in 1882 when the company filed its map of definite location, constituted "claims," within the meaning of the act of 1864, then it was not competent for the defendants, by any admission *they* might make, for whatever purpose made, as to the quality of these lands, whether mineral or not, to eliminate from the case the essential fact that these "claims" existed of record when the line of the road was definitely located. Indeed, if it now appeared that the land office finally adjudged, after the definite location of the road, that the lands embraced by those applications were not mineral, they could not be held to have passed to the railroad company under the act of 1864, for the reason that they were not, at the time of such definite location, free from preëmption or "other claims or rights."

Any other interpretation would defeat the evident purpose of Congress in excepting from railroad grants lands upon which claims existed of record at the time the road to be aided was definitely located. What that purpose was has been frequently adverted to by this court. In *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, 639, 640, 641, 644, which case involved the construction of an act of Congress exclud-

ing from a railroad grant public lands sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim may have attached at the time the line of its road was definitely fixed, this court said: "It is argued by the company, that, although Miller's homestead entry had attached to the land, within the meaning of the excepting clause of the grant, before the line of definite location was filed by it, yet when Miller abandoned his claim, so that it no longer existed, the exception no longer operated, and the land reverted to the company — that the grant by its inherent force reasserted itself and extended to or covered the land as though it had never been within the exception. . . . This filing of the map of definite location furnished also the means of determining what lands had previously to that moment been sold, reserved or otherwise disposed of by the United States, and to which a preëmption or homestead claim had attached; for, by examining the plats of this land in the office of the register and receiver, or in the General Land Office, it could readily have been seen if any of the odd sections within ten miles of the line had been sold, or disposed of, or reserved, or a homestead or preëmption claim had attached to any of them. In regard to all such sections they were not granted." Again: "The company had no absolute right until the road was built, or that part of it which came through the land in question. The homestead man had five years of residence and cultivation to perform before his right became absolute. The preëmptor had similar duties to perform in regard to cultivation, residence, etc., for a shorter period, and then payment of the price of the land. It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the Government as to the performance of their obligations. The reasonable purpose of the Government

undoubtedly is that which it expressed, namely, while we are giving liberally to the railroad company, we do not give any lands we have already sold, or to which, according to our laws, we have permitted a preëmption or homestead right to attach. No right to such land passes by this grant. No interest in the railroad company attaches to this land or is to be founded on this statute. Such is the clear and necessary meaning of the words that there is granted every alternate section of odd numbers to which these rights have not attached. It necessarily means that, if such rights have attached, they are not granted." Finally, and as showing the meaning of the word "attached," the court said: "In the case before us a claim was made and filed in the land office, and there recognized, before the line of the company's road was located. That claim was an existing one of public record in favor of Miller when the map of plaintiff in error was filed. In the language of the act of Congress this homestead claim had *attached* to the land, and it therefore did not pass by the grant. . . . The right of the homestead having attached to the land, it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds."

In *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357, 366, after an extended reference to the authorities and to the uniform practice of the Land Department, the court concluded : "For the foregoing reasons we concur with the court below that Turner's homestead entry excepted the land from the operation of the railroad grant ; and that upon the cancellation of that entry the tract in question did not inure to the benefit of the company, but reverted to the Government and became a part of the public domain, subject to appropriation by the first legal applicant."

In *Whitney* v. *Taylor*, 158 U. S. 85, 92–93, where the contest was between a railroad grant of public lands and a homestead entry of record at the time of the filing of the company's map of definite location, the question now before us was again fully considered, and this principle deduced from the former cases: "Although these cases are none of them

exactly like the one before us, yet the principle to be deduced from them is that when on the records of the local land office there is an existing claim on the part of an individual under the homestead or preëmption law, which has been recognized by the officers of the Government and has not been cancelled or set aside, the tract in respect to which that claim is existing is excepted from the operation of a railroad land grant containing the ordinary excepting clauses, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the Government at its own suggestion, or upon the application of other parties. It was not the intention of Congress to open a controversy between the claimant and the railroad company as to the validity of the former's claim. It was enough that the claim existed, and the question of its validity was a matter to be settled between the Government and the claimant, in respect to which the railroad company was not permitted to be heard."

Other cases are to the same effect as those to which we have above referred. *Sioux City &c. Land Co.* v. *Griffey*, 143 U. S. 32, 34; *Shiver* v. *United States*, 159 U. S. 491, 494.

The principles announced in these cases fully sustain the proposition that if the above applications, of record, to purchase these lands as mineral lands were "claims" within the meaning of the act of July 2, 1864, then the lands were excepted from the operation of that act, and could not have come under the grant to the railroad company even if, subsequently to the definite location of the road, the applications for them were finally rejected because of the fact that they were ascertained not to be mineral lands.

It is necessary now to inquire whether the applications in 1880 and 1881 to purchase these lands as mineral lands were "claims" within the meaning of the act of 1864.

Here we are met with the suggestion that when that act was passed no statute of the United States provided for the purchase of lands as mineral lands, and that when the railroad company filed its map of general route in 1872, and when the surveyed or unsurveyed odd-numbered sections within the exterior lines of that route were withdrawn by the land

office from "sale or location, preëmption or homestead
entry," no application was on file to purchase these lands as
mineral lands.

It is quite true that at the time of the passage of the act of
1864 there was no act of Congress under which a right or
claim could be initiated to mineral lands. But as said by Mr.
Justice Field in *Jennison* v. *Kirk*, 98 U. S. 453, 458, "for
eighteen years — from 1848 to 1866 — the regulations and
customs of miners, as enforced and moulded by the courts and
sanctioned by the legislation of the States, constituted the law
governing property in mines and in water on the public mineral
lands." And on July 26, 1866, before the general route of the
Northern Pacific Railroad was fixed, Congress passed an act
looking to a sale of the mineral lands of the United States,
and declared them to be "free and open to exploration and
occupation by citizens of the United States and those who
have declared their intention to become citizens, subject to
such regulations as may be prescribed by law and the local
customs or rules of miners in the several mining districts so far
as the same were not in conflict with the laws of the United
States." 14 Stat. 251, c. 262. But prior to the passage of
that act certain important rights of miners had been recog-
nized. In *Broder* v. *Water Co.*, 101 U. S. 274, 276, it was said
to be the established doctrine of this court that the rights of
miners, who had taken possession of mines and worked and
developed them, were rights which the Government had by
its conduct recognized and encouraged, and was bound to pro-
tect, before the passage of the act of 1866. The act of 1866
was held to be a statutory recognition of the right to explore
for mineral lands. That right was in nowise impaired, in re-
spect of the lands in question, by the subsequent acceptance
from the Northern Pacific Railroad Company of its map of
general route. And that act was supplemented by the act of
May 10, 1872, c. 152. 17 Stat. 91. The company acquired,
by fixing its general route, only an inchoate right to the odd-
numbered sections granted by Congress, and no right attached
to any specific section until the road was definitely located
and the map thereof filed and accepted. Until such definite

location it was competent for Congress to dispose of the public lands on the general route of the road as it saw proper. Provision for the indemnification of the company in such an emergency was made by a clause in the act of 1864, providing that wherever, prior to the date of definite location, " any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of such alternate sections." 13 Stat. 368. Hence it was said in *Barden* v. *Northern Pacific Railroad Company*, 154 U. S. 288, 320, in which case the act of 1864 was construed, that the privilege of exploring for mineral lands was in full force at the time of the location of the definite line of road, and was a right reserved and excepted out of the grant at that time.

In this view — of the soundness of which we entertain no doubt — it would seem to be clear that the formal applications made in 1880 and 1881, under the statutes then and still in force, to purchase these lands as mineral lands, were " claims " within the meaning of the third section of the act of 1864. It was admitted by the demurrer that applicants made oath, before the proper officer, that they had discovered mineral thereon and had located the said quarter section as mineral land, and claimed the same as having valuable mineral deposits thereon. Upon the present record it cannot be said that those applications were not made in good faith. Whether the lands sought to be purchased as mineral lands were of that character was a matter for the determination, in the first instance, of the Land Department; and there was jurisdiction in that department to pass upon every question arising upon applications to purchase them as mineral lands. How then can it be said that such applications, filed and of record before the definite location of the road, were not " claims " within the meaning of the act of 1864? As the lands in question were not free from those claims at the time the plaintiff definitely located its line of road, it is of no consequence what

disposition was or has been made of the claims subsequent to that date.

The only ground upon which a contrary view, can be rested is the provision in the sixth section of the act of 1864, that "the odd sections of land hereby granted shall not be liable to sale or entry or preëmption before or after they are surveyed, except by said company, as provided by this act." But this section is not to be construed without reference to other sections of the act. It must be taken in connection with section three, which manifestly contemplated that rights of preëmption or other claims and rights might accrue or become attached to the lands granted after the general route of the road was fixed and before the line of definite location was established. Literally interpreted, the words above quoted from section six would tie the hands of the Government so that even it could not sell any of the odd-numbered sections of the lands after the general route was fixed — an interpretation wholly inadmissible in view of the provisions in the third section. The third and sixth sections must be taken together, and so taken it must be adjudged that nothing in the sixth section prevented the Government from disposing of any of the lands prior to the fixing of the line of definite location, or, for the reasons stated, from receiving, under the existing statutes, applications to purchase such lands as mineral lands.

Much was said at the bar as to the decision of this court in *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55. On one side it is said that that case construes the sixth section of the act of 1864 as excluding the possibility of *any* right being acquired adversely to the railroad company to an odd-numbered section embraced by the exterior lines of the general route after that route had been established. On the other side it is contended that the only point necessary to be determined and the only one judicially determined in that case was that the defendant could not initiate a preëmption right to the land there in dispute so long as the Indian title referred to in the opinion was unextinguished. Without stopping to examine these contentions, it is sufficient to say that

the *Buttz case* involved no inquiry as to the respective rights of the railroad company under the act of 1864, and of parties making applications in due form prior to the definite location of its road to purchase lands as mineral lands that were within the exterior lines of its general route. Mr. Justice Field delivered the opinion in the *Buttz case*, and, speaking for the court in *Barden* v. *Northern Pacific Railroad Company*, above cited, stated that the grant in that act excepted the privilege of exploring for mineral lands.

For the reasons stated, we adjudge that the lands in question were excluded from the grant of 1864 by reason of the pendency of record, at the time of the definite location of the plaintiff's road, of applications to purchase them as mineral lands, such applications being in the form prescribed by the acts of Congress that related to such lands, and undetermined when the company filed its map of definite location.

The judgment below is

*Affirmed.*