# NORTHERN PACIFIC RAILWAY COMPANY *v.* DE LACEY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 154.  Argued and submitted January 18, 1899. — Decided May 22, 1899.

The right of Flett, under whom De Lacey claims, was a right of preëmption only, which ceased at the expiration of thirty months from the filing of its statement, by reason of the failure to make proof and payment within the time required by law, and it is not necessary, in order that the law shall have its full operation, that an acknowledgment of the fact should be made by an officer in the land office, in order to permit the law of Congress to have its legal effect; and when the defendant settled upon the land in April, 1886, and applied to make a homestead entry thereon, his application was rightfully rejected.

The record shows that at the time of the commencement of this action the railway company was the owner and entitled to the immediate possession of the land in controversy, and that it was entitled therefore to judgment in its favor.

THIS is an action of ejectment brought by the plaintiff in error against the defendant to recover possession of 160 acres of land situated not far from Tacoma in the State of Washington.

The land lies within the primary limits of the land grant both of the main line of the railroad of plaintiff in error, as definitely located between Portland and Puget Sound, and the Cascade branch, as definitely located between the point where the railroad leaves the main line and crosses the Cascade Mountains to Puget Sound.

It appears from the facts found upon the trial, without a jury, that the plaintiff's predecessor was incorporated under the act of Congress of July 2, 1864, c. 217, 13 Stat. 365, and received a grant of public lands by virtue of section 3 of that act. A further grant was made by virtue of the joint resolution of Congress, adopted May 31, 1870. 16 Stat. 378, Resolution No. 67.

The company surveyed and definitely located the line of its

branch road extending from Tacoma to South Prairie, and on March 26, 1884, filed its map, showing such line of definite location, in the office of the Commissioner of the General Land Office. The land in controversy is within the limits of the grant to the company as defined by this map of definite location, and is within the limits of the grant under the act of July 2, 1864.

The following statement is taken from the finding of facts by the trial judge:

"XII. April 9, 1869, one John Flett filed declaratory statement No. 1227, declaring his intention to purchase certain lands which are described in the complaint, under the laws of the United States authorizing the preëmption of unoffered lands. Whether or not Flett was at this time qualified to enter the land under the preëmption or homestead laws does not appear.

"XIII. In the fall of 1869 Flett left the land in controversy and did not thereafter reside thereon, although it is recited in the decision of the Secretary of the Interior in a contest between the railroad company, De Lacey, Flett, et al., before the Interior Department, involving the land here in controversy, that in September, 1870, Flett went to the local land office and told the officers that he had come to prove up on his claim; that they told him it was railroad land and that he had lost it; that Flett did not then actually offer to make proof, but acquiesced in the advice of the local officers that he was not entitled to submit proof under his filing."

"XV. The defendant, James De Lacey, settled upon the land in controversy in April, 1886. April 5, 1886, he applied to make homestead entry thereon. His application was rejected for the reason that the land fell within the limits of the grant to the railroad company on both main and branch lines. From this decision by the register and receiver De Lacey appealed to the Commissioner of the General Land Office.

"XVI. September 7, 1887, John Flett submitted proof in support of his preëmption claim, founded upon his declaratory statement filed April 9, 1869.

"XVII. Afterward, under the instructions of the Commissioner, a hearing was had, at which all the parties, the railroad company, James De Lacey, John Algyr and John Flett were present. July 27, 1889, the receiver of the district land office found that Flett had not voluntarily abandoned the land in 1869, and that his entry should be reinstated. From this finding all the parties but Flett appealed to the Commissioner of the General Land Office, and December 5, 1889, the Commissioner sustained the finding of the receiver. Thereafter the other parties to the contest appealed to the Secretary of the Interior. September 28, 1891, the Secretary of the Interior reversed the ruling of the Commissioner of the General Land Office, and awarded the land in controversy to the railroad company.

"December 13, 1892, letters patent of the United States, regular in form, were issued, conveying the land in controversy to the plaintiff."

"XIX. Flett's declaratory statement was not formally cancelled upon the records until December 23, 1891.

"XX. The defendant is in possession of the land and withholds such possession from the plaintiff."

It also appeared that the railroad company on May 10, 1879, transmitted to the office of the Secretary of the Interior a map showing its relocated line of general route, which map was on June 11, 1879, sent to the Commissioner of the General Land Office by the Secretary for filing, with instructions to withdraw the lands coterminous therewith from sale, preemption or entry for the benefit of the railroad company, and the map was duly filed on that day. The land in controversy is within the line as relocated.

The conclusions of law of the Circuit Court were in favor of the railroad company, and the court held that prior to June 11, 1879, when the map of general route as relocated was filed, and after the abandonment of the land by John Flett, the same was public land of the United States, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, and that from that date (June 11, 1879) the land was reserved from sale,

preëmption or entry, except by the railroad company, by virtue of fixing the line of general route of the branch line coterminous therewith; that this reservation became effective from and after the receipt of the order of the Commissioner at the United States district land office on July 19, 1879.

Judgment in favor of the plaintiff for the recovery of the possession of the land was duly entered.  Upon appeal by the defendant to the Circuit Court of Appeals for the Ninth Circuit, that court reversed the judgment and remanded the cause to the Circuit Court for further proceedings not inconsistent with the views expressed in the opinion of the Court of Appeals.  Judgment in accordance with the opinion of that court was subsequently entered by the Circuit Court, dismissing the plaintiff's complaint, and awarding costs to the defendant.  This was done under objection of plaintiff, which claimed the right to a new trial, and exception was taken thereto.

It appearing that the plaintiff, the Northern Pacific Railway Company, had subsequently to the hearing acquired the rights of the original plaintiff to the property described in the complaint, it was substituted as plaintiff in this action. A writ of error was then taken to the United States Circuit Court of Appeals for the Ninth Circuit, where the judgment of the Circuit Court was affirmed.  The plaintiff by writ of error brought the case here for review.

The opinion of the Circuit Judge, given upon the trial of the cause, is reported in 66 Fed. Rep. 450, and that of the Circuit Court of Appeals in 44 U. S. App. 257.

*Mr. C. W. Bunn* for plaintiff in error.  *Mr. James B. Kerr* was on his brief.

*Mr. W. H. Pritchard* for defendant in error submitted on his brief.

*Mr. Solicitor General* and *Mr. Assistant Attorney Russell* for the United States submitted on their brief.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The grant of lands to aid the construction of that portion of the main line of the railroad of the plaintiff in error, between Portland and Puget Sound, dates from the joint resolution of May 31, 1870, and prior to that time there was no land grant in aid of the construction of that portion of the road. *United States* v. *Northern Pacific Railroad Company*, 152 U. S. 284, 292.

At the time of the adoption of the resolution of 1870 there had been filed, April 9, 1869, in the local land office the statement of John Flett, declaring his intention to purchase the lands in dispute under the laws of the United States authorizing the preëmption of unoffered lands, and that entry being unforfeited and uncancelled, operated to except the lands from that grant. We may therefore confine our attention to the grant under the act of July, 1864, and the subsequent proceedings which relate to that grant.

At the time of the passage of that act the United States owned the land in question as public land, and as to that land it had, as specified in the third section thereof, " full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption, or other claims or rights," and no portion of this land had at that time been " granted, sold, reserved occupied by homestead settlers, or preëmpted, or otherwise disposed of." On the 26th of March, 1884, the plaintiff had filed its map of definite location in the office of the Commissioner of the General Land Office, which map embraced the land in controversy.

The filing of such a map of definite location of a railroad determines the right of the railroad company to the land under the land grant acts of Congress. *Kansas Pacific Railway Company* v. *Dunmeyer*, 113 U. S. 629; *Sioux City &c. Company* v. *Griffey*, 143 U. S. 32, a grant similar in its nature to the one under consideration.

If there had been a preëmption claim at the time of the passage of the act of 1864, the land would not have passed under that grant. *Bardon* v. *Northern Pacific Railroad*, 145 U. S. 535.

It is contended that at the time (March 26, 1884) when the map of definite location was filed, the declaratory statement of Flett, filed in the local land office in 1869, remained there as a record, and was an assertion of a preëmption claim, and the defendant maintains that under the case of *Whitney* v. *Taylor*, 158 U. S. 85, the land described in that declaratory statement was excepted from the grant to the railroad company, and that the company therefore never acquired title to the land by filing its map of definite location under the grant contained in the act of 1864.

The learned judge, in delivering the opinion of the Circuit Court of Appeals in the case at bar, quoted the following language from the opinion of this court in *Whitney* v. *Taylor*, 158 U. S. 85, 92.

"That when on the records of the local land office there is an existing claim on the part of an individual under the homestead or preëmption law, which has been recognized by the officers of the government and has not been cancelled or set aside, the tract in respect to which that claim is existing is excepted from the operation of a railroad land grant containing the ordinary excepting clauses, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the Government at its own suggestion or upon the application of other parties. It was not the intention of Congress to open a controversy between the claimant and the railroad company as to the validity of the former's claim; it was enough that the claim existed, and the question of its validity was a matter to be settled between the Government and the claimant, in respect to which the railroad company was not permitted to be heard."

The Circuit Judge then stated that the controlling fact in this case was "that at the time of the definite location of the plaintiff's road, opposite which the land in controversy is situated, there was on the record of the local land office Flett's declaratory statement which had not been altered, amended, cancelled or set aside; and that fact operated to except the land in respect to which the claim existed from the grant to the railroad company."

The single question in this case is, therefore, whether the proceedings in the case of Flett were of such a nature as to prevent the grant to the company under the act of 1864 from taking effect at the time of the filing of its map of definite location, March 26, 1884.

The defendant contends that the land in controversy was excluded by operation of law from the grant of 1864 by the resolution of May 31, 1870. Herein he assumes that the effect of that resolution was to blot out the grant under the act of 1864. The resolution did not have that effect. It was not an amendment to the third section of the act of 1864 which granted the lands. If at that time (1870) certain claims had been filed against this land by reason of which it was excepted from the grant of 1870, such fact has no bearing upon the provisions of the act of 1864, at which time there was no claim upon this land, and if none existed when the map of definite location was filed in 1884, the grant included the land. The assertion that when the grant of 1864 was made there was a preëmption claim in existence is not borne out in law or fact by asserting the existence of such a claim when the grant of 1870 was made, and that by operation of that resolution the grant of 1864 was so amended as to exclude that land. It was not excluded. The fact that no claim existed at the time the act of 1864 was passed remained notwithstanding the adoption of the resolution of 1870, and the question therefore still recurs whether in 1884, when the map of definite location was filed, there was any claim upon this land which excepted it from the grant by virtue of the act of 1864.

It is well to examine the statutes relating to the right of preëmption under which the declaratory statement of Flett was filed in order to determine the rights, if any, which he had at the time when the company's map of definite location was filed.

That statement, filed by Flett in 1869, was to the effect that he intended to purchase the land which he described, " under the laws of the United States, authorizing the preëmption of unoffered lands." By the term "unoffered lands" is meant those public lands of the United States which have not been

offered at public sale.   By section 3, chapter 51, of the act of Congress making further provision for the sale of public lands, approved April 24, 1820, c. 51, 3 Stat. 566, the price for which public lands should be offered for sale after the first day of July, 1820, was fixed at $1.25 an acre, and it was provided that at every public sale the highest bidder, who should make payment as prescribed, should be the purchaser, but no land was permitted to be sold at either public or private sale for a less price than $1.25 an acre ; and it was further provided in that section that " All the public lands which shall 'have been offered at public sale before the first day of July next, and which shall then remain unsold, as well as the lands that shall thereafter be offered at public sale, according to law, and remain unsold at the close of such public sales, shall be subject to be sold at private sale, by entry at the land office, at one dollar and twenty-five cents an acre, to be paid at the time of making such entry as aforesaid ; with the exception," etc.

After the passage of this act the public lands came to be spoken of as " unoffered lands," or those which had not been exposed to public sale, and " offered lands," or those which had been so exposed and remained unsold, and under the statute regulating the sales of public lands it would seem that unoffered land could not be purchased at any price or in any manner in advance of the public sale, while offered land was at all times subject to purchase by the first applicant at a fixed price.   *Johnson* v. *Towsley*, 13 Wall. 72, 88.

By the act approved September 4, 1841, c. 16, entitled " An act to appropriate the proceeds of the sales of the public lands, and to grant preëmption rights," 5 Stat. 453, there was granted, by the tenth section thereof, to every person being the head of a family, etc., " who since the first day of June, A.D. eighteen hundred and forty, has made or who shall hereafter make a settlement in person on the public lands to which the Indian title had been at the time of such settlement extinguished, and which has been, or shall have been, surveyed prior thereto, and who shall inhabit and improve the same, and who has or shall erect a dwelling thereon, shall be, and is hereby, authorized to enter with the register of the land office

for the district in which such land may lie, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land, subject, however, to the following limitations and exceptions," etc.

By this section it will be seen that the right of preëmption was extended equally to unoffered and offered lands.

By section 14 it was provided, however, that the selection of unoffered lands should not delay the sale of such lands beyond the time which might be appointed by the proclamation of the President, nor should the provisions of the act be available to any person who should fail to make the proof and payment and file the affidavits required, under section 13 of the same act, before the day appointed for the commencement of the sales.

In regard to the so-called offered lands, it was provided by section 15 of the act as follows:

" SEC. 15. *And be it further enacted*, That whenever any person has settled or shall settle and improve a tract of land, subject at the time of settlement to private entry, and shall intend to purchase the same under the provisions of this act, such person shall in the first case, within three months after the passage of the same, and in the last within thirty days next after the date of such settlement, file with the register of the proper district a written statement, describing the land settled upon, and declaring the intention of such person to claim the same under the provisions of this act; and shall, where such settlement is already made, within twelve months after the passage of this act, and where it shall hereafter be made, within the same period after the date of such settlement, make the proof, affidavit and payment herein required ; and if he or she shall fail to. file such written statement as aforesaid, or shall fail to make such affidavit, proof and payment, within the twelve months aforesaid, the tract of land so settled and improved shall be subject to the entry of any other purchaser."

The result of the passage of this act was to grant the right to preëmpt 160 acres of either offered or unoffered land, and

that as to the unoffered lands the filing of a preëmption declaratory statement was not required, and the right of the preemptor to make due proof and payment remained until the time fixed by the proclamation of the President for the public sale of lands, at which time (if the proper proof and payment' had not been made) the lands might be offered and sold to the highest bidder, and if not sold they would become subject to private entry by the first applicant at the minimum price.   As to the offered lands, the right of the preëmptor was dependent upon his filing a declaratory statement in the local office, as stated in section 15 of the act above quoted.

By the fifth section of the act approved March 3, 1843, c. 86, 5 Stat. 619, it was provided that settlers under the preemption act of 1841, upon unoffered land, should "make known their claims, in writing, to the register of the proper land office, within three months from the date of this act when the settlement has already been made, and within three months from the time of the settlement when such settlement shall hereafter be made, giving the designation of the tract and the time of settlement; otherwise his claim to be forfeited and the tract awarded to the next settler, in the order of time, on the same tract of land, who shall have given such notice and otherwise complied with the conditions of the law."

Taking these two acts of 1841 and 1843 and reading them together, it is seen that there was a difference between unoffered and offered lands by reason of the fact that on unoffered lands the right or privilege to secure land by a preëmption filing continued up to the commencement of the public sale whenever that might be, and if that right or privilege had not been exercised and the land was offered at public sale and not sold, it then became subject to private entry by the first applicant, while on offered lands the right or privilege to secure them by a preëmption filing continued for twelve months after the date of the settlement, and if the preëmptor failed to file the declaratory statement or make the proper affidavit within the twelve months, "the tract of land so settled and improved shall be subject to the entry of any other purchaser."

Congress by an act approved May 20, 1862, c. 75, 12 Stat. 392, provided for the sale of public lands for homesteads, and since that time the practice of disposing of the public lands at public sale has gradually been abandoned, although the authority remained. The abandonment of these public sales resulted in giving to those who had made preëmption filings upon unoffered land an uncertain time within which to prove or complete their proof and payment, because their time lasted until the day of the public sale proclaimed by the President. As these public sales were abandoned, the result was that these claimants were not under any obligation to make proof and payment at all.

By the second section of the act approved July 14, 1870, c. 272, 16 Stat. 279, it was provided that "all claimants of preëmption rights shall hereafter, when no shorter period of time is now prescribed by law, make the proper proof and payment for the lands claimed, within eighteen months after the date prescribed for filing their declaratory notices shall have expired: *Provided*, That where said date shall have elapsed before the passage of this act, said preëmptors shall have one year after the passage hereof in which to make such proof and payment."

That act was amended by resolution No. 52, approved March 3, 1871, 16 Stat. 601, by which twelve months in addition to that provided in the act were given to claimants to make proof and payment. Adding the twelve months given by this resolution to the eighteen months given by the act of 1870, all claimants of preëmption rights were given thirty months to make the proper proof and payment for the lands claimed.

These various provisions are found in the United States Revised Statutes from section 2257 to and including section 2267, the latter section giving the thirty months as stated.

We thus find that since 1871 all claimants of preëmption rights lost those rights by operation of law, unless within thirty months after the date prescribed for filing their declaratory notices they made proper proof and payment for the lands claimed. The filing of their declaratory statement,

and the record made in pursuance of that filing became without legal value if within the time prescribed by the statute proper proof and payment were not made. Whether such proof and payment were made would be matter of record, and if they were not so made the original claim was cancelled by operation of law, and required no cancellation on the records of the land office to carry the forfeiture into effect. The law forfeited the right and cancelled the entry just as effectually as if the fact were evidenced by an entry upon the record. The mere entry would not cause the forfeiture or cancellation. It is the provision of law which makes the forfeiture, and the entries on the record are a mere acknowledgment of the law, and have in and of themselves, if not authorized by the law, no effect. The law does not provide for such a cancellation before it is to take effect. The expiration of time is a most effective cancellation.

In such a case as this, where the forfeiture occurs by the expiration of the thirty months within which to make proof and payment, the record shows that the claim has expired; that it no longer exists for any purpose, and therefore it cannot be necessary in order that the law shall have its full operation that an acknowledgment of the fact should be made by an officer in the land office. The law is not thus subject to the act or the omission to act of that officer.

The case of *Whitney* v. *Taylor*, 158 U. S. 85, cited in the opinion of the Circuit Court of Appeals as decisive of the case at bar, we think has not the effect given to it by the learned court below. The land in that case was within the granted limits of the grant to the Central Pacific Railroad Company by the act of July 1, 1862, c. 120, 12 Stat. 489. That company filed its map of definite location March 26, 1864. It was held that the tract being subject to the preëmption claim of one J., at the time when the grant to the railroad company took effect, was excepted from the operation of that grant. It was subject to the claim of J. because in May, 1857, he had filed his statement, paid the fees required by law, and the filing was duly entered in the proper government record; and at that time, as has been seen by the above review of the stat-

utes, there was no period within which a preëmptor was compelled to prove up and pay for his claim, except that it should be done before the land was offered at public sale by the proclamation of the President. The tract in dispute had not been so offered at the date of the definite location of the road, and it was held that J.'s time to make proof and payment had not expired at the time of the filing of the map of definite location, and that consequently his was an existing claim of record at that date.

The citation from the opinion of the court in *Whitney* v. *Taylor* shows that the statement was made with reference to that important and material fact; that it was an existing claim on the part of the claimant at the time of the filing of the map of definite location. Whether that claim were an enforceable one or whether there were facts which when brought to the attention of the Government might induce it to cancel it, or the fact that the Government might at its own suggestion cancel the claim, were held not to affect the question. The material fact that it was an existing claim was the fact upon which the case was decided.

In this case, such fact does not exist. There was no existing claim at the time of the filing of the map of definite location by the plaintiff herein. It had expired and become wholly invalid by operation of law. The thirty months had expired years before the filing of this map.

In *Northern Pacific Railroad Company* v. *Colburn*, 164 U. S. 383, 388, it was stated in the course of the opinion that there were "other questions in this case, such as the significance of an *expired filing*," which were not considered by the Supreme Court of the State or noticed by counsel, and which were left for consideration thereafter. This shows that the case of *Whitney* v. *Taylor* was not regarded by the court, or by the justice who wrote the opinion therein, as having a controlling bearing upon the question as to the effect of an expired filing under circumstances such as are developed in this case.

If claims which were of such a nature as to be described as "existing" were made in regard to any of the lands which

otherwise might be included in the grant to the railroad company, we reiterate what was said in the *Dunmeyer case*, that it is not conceivable that Congress intended to place those parties, the railroad company and the various claimants to the land, in the attitude of contestants, with the right in each to require proof from the other of complete performance of its obligations.   On the contrary, we would say that if there were at the time of the filing of the map of definite location an actual existing claim, even though it might turn out to be wholly unfounded, the land thus claimed would not pass by the grant.   This has been decided as lately as *Northern Pacific Railroad Company* v. *Sanders*, 166 U. S. 620.   In the case under consideration there was, at the time of the filing of the map of definite location, no claim within the meaning of the statute.

The right of Flett, obtained by the filing of his statement, was the right of preëmption only.   In other words, the right of purchase before any other person, and by the law of Congress that right ceased at the expiration of thirty months from the filing of that statement.   Thereafter there was no claim, for it had ceased and determined, and with reference to the right it was of no more validity after the expiration of that time than if the statement had never been filed. After the filing of a statement and while the time is running within which to make proof, there is an inchoate right on the part of the preëmptor which the Government recognizes, as in *Frisbie* v. *Whitney*, 9 Wall. 187.

It was held in *Johnson* v. *Towsley*, 13 Wall. 72, 90, that in case the preëmptor failed to file his declaration of intention within three months from the time of settlement, as provided for in the fifth section of the act of 1843, c. 86, 5 Stat. 619, 620, he nevertheless would have the right after the expiration of the three months, being in possession, to then make and file his declaration, provided no other party had made a settlement or had given notice of his intention to make one and no one would be injured by the delay.   But the case is far from holding that after the declaration has been filed and the time in which to prove up and make pay-

ment upon his claim has wholly expired, the claim nevertheless still exists in sufficient force to prevent the transfer of title to the company under the act of Congress, simply because the officer of the land office has failed to perform a mere ministerial duty by cancelling of record a claim which has really ceased to exist by operation of law. A claim is not an existing one where by the record it appears that the right to make proof and payment has expired under the terms of the statute.

It appears that it has not been the practice of the Interior Department to enter any formal cancellation of an expired preëmption filing upon the books of the office; its practice has been to take no action concerning them. They have simply been treated as abandoned claims. *State of Alabama*, 3 L. D. 315, 317.

Reference is made in the briefs to the circular of Commissioner Drummond, dated September 8, 1873, in which he says:

"By the operation of law limiting the period within which proof and payment must be made in preëmption cases, such claims are constantly expiring, the settler not appearing within such time to consummate his entry. These expired filings are classed with those actually abandoned or relinquished."

And again in the circular of November 8, 1879, the Commissioner said:

"Where application is made by a railroad company to select lands on which preëmption filings have heretofore been made and cancelled, or where the same have expired by limitation of law, no other claim or entry appearing of record, you will admit the selections, in accordance with the rules governing in the premises herein communicated. No proofs by the companies concerning such claims will hereafter be required."

The effect given by the land department to what is termed an "expired filing" of the nature of the one in suit has not been uniform. It was in substance held in some cases that such expired filing amounted to a claim within the meaning

of the statute, and that the land did not pass under the grant to the railroad company. *Emmerson* v. *Central Pacific Railroad Company*, 3 L. D. 117; same case on motion for a rehearing, 3 L. D. 271; *Schetka* v. *Northern Pacific Railroad Company*, 5 L. D. 473; *Allen* v. *Northern Pacific Railroad Company*, 6 L. D. 520; *Fish* v. *Northern Pacific Railroad Company*, 21 L. D. 165; same case on motion for a rehearing, 23 L. D. 15. On the other hand, we have been referred to the cases of *Northern Pacific Railroad Company* v. *Stovenour*, 10 L. D. 645; *Meister* v. *St. Paul &c. Railroad Company*, 14 L. D. 624; *Union Pacific Railroad Company* v. *Hartwich*, 26 L. D. 680; *Wight* v. *Central Pacific Railroad Company*, 27 L. D. 182; *Central Pacific Railroad Company* v. *Hunsaker*, 27 L. D. 297. The last two cases cited touch the question very remotely, if at all.

The latest decision of the land office to which our attention has been called is that of *Union Pacific Railroad Company* v. *Fisher*, decided February 1, 1889. 28 L. D. 75. In that case the Secretary refers to the cases which have been cited above, holding that an expired filing excepted the land from a grant to the railroad company, and he gives his reasons for the decisions of the department in those cases, which he thinks render them not altogether in conflict with the other decisions of the department.

Although these decisions are somewhat inharmonious, it would seem that the practice of the department not to enter as cancelled an expired filing has been uniform, and the record has been left to speak for itself.

For the reasons which we have already given, we think it was unnecessary to enter the cancellation on the record of the office in order to permit the law of Congress to have its legal effect. That effect should not be dependent upon the action or non-action of any officer of the land department. When no proof and no payment have been made within the time provided for by the law, the record will show that fact, and that the right of the claimant has expired and the claim itself has ceased to exist.

A case of this kind, which simply necessitates a reference

to the record to ascertain whether the filing had expired and with it the rights of the claimant, differs from the case where a filing may have become subject to cancellation; but the record does not show it, and the right to cancel depends upon evidence to be found *dehors* the record. In such case, while the facts might invalidate the claim, yet as they are not of record and require to be ascertained, the claim itself, though possibly not enforceable, is still an existing claim within the meaning of the law, and it would remain such until cancellation had taken place or some other act done legally terminating the existence of the claim.

Upon the facts as found in this case, it seems to us that there was no claim against the land at the time of the passage of the act of 1864, and that years before the time of the filing of the map of definite location in 1884 the claim that once existed (in 1869) in favor of Flett had ceased to exist in fact and in law, and the title to the land passed to the railroad company by virtue of the grant contained in the act of 1864 and by reason of the filing of its map of definite location March 26, 1884. When, therefore, the defendant settled upon the land in April, 1886, and applied to make homestead entry thereon, his application was rightfully rejected for the reason that title to the land had passed to the railroad company, as above mentioned, and therefore he was not entitled to make the entry.

For the same reason, when John Flett, in September, 1887, submitted proof in support of his preëmption claim, founded upon his declaratory statement filed April 9, 1869, (and which claim he had abandoned since 1870,) he was too late. His right had expired many years before 1884, at which time the right to the land passed to the company, and he had no right to prove up on his abandoned and expired claim.

The record shows that at the time of the commencement of this action the railroad company was the owner and entitled to the immediate possession of the land in controversy, and that it was entitled therefore to judgment in its favor, and the courts below erred in dismissing its complaint.

*The judgment of the United States Circuit Court of Appeals for the Ninth Circuit is reversed, and the case remanded to the Circuit Court for the Western Division, District of Washington, for further proceedings not inconsistent with the opinion of this court.*

MR. JUSTICE HARLAN and MR. JUSTICE McKENNA dissented.