### NORTHERN PAC. RY. CO. v. McCORMICK.

(Circuit Court of Appeals, Ninth Circuit. May 22, 1899.)

#### No. 496.

1. PUBLIC LANDS—NORTHERN PACIFIC RAILROAD GRANT—PRE-EMPTION RIGHTS.

The provision of section 6 of the Northern Pacific Railroad grant, that "the odd sections of land hereby granted" should not be liable to sale, or entry or pre-emption before or after their survey, except by the company, must be construed in connection with section 3, containing the grant, and which limited the same to lands to which the United States should "have full title * * * free from pre-emption or other claims or rights at the time the lien of said road is definitely fixed and the plat thereof filed." Hence lands to which pre-emption rights had attached at any time prior to the filing of the map of definite location, being reserved from the grant, were not within the provisions of section 6, and up to that time the right of pre-emption was not affected by anything in the act, or by the filing of the map of general route thereunder.

2. SAME—PRE-EMPTION RIGHTS—SETTLER ON UNSURVEYED LAND

A qualified settler, who enters upon and improves unsurveyed public land, with the intention of obtaining title thereto under the pre-emption laws, has a claim thereon, which is a right of pre-emption, and which continues until three months after the map of survey of the land has been filed in the land office, unless his entry is sooner made; and where a settler was so occupying and residing upon a tract of unsurveyed land at the time of the filing of the map of definite location of the line of the Northern Pacific Railroad, which brought the land within the boundaries of its grant, although the settler had made no application for entry, such land was at that time subject to a "pre-emption claim or right," within the meaning of the reservation clause of the act making such grant, and the company acquired no title thereto.

Gilbert, Circuit Judge, dissenting.

## In Error to the Circuit Court of the United States for the District of Montana.

This is an action of ejectment brought in the circuit court of the United States for the district of Montana by the plaintiff in error against the defendant in error to recover possession of the S. ½ of the N. W. ¼ and the W. ½ of the S. W. ¼ of section 21, township 13 N., range 18 W., principal meridian of Montana. It is alleged in the complaint that the plaintiff is a corporation created by, and organized and existing under, the act of congress approved July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific Coast, by the northern route," and acts and resolutions amendatory thereof; that by the terms of said act plaintiff was authorized and empowered to lay out, locate, construct, furnish, and maintain a continuous railroad and telegraph line, with the appurtenances, from a point on Lake Superior to a point on Puget Sound; that there was granted to plaintiff by congress every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of said railroad line, as plaintiff might adopt, through the territories of the United States, and 10 alternate sections of land per mile on each side of said railroad whenever it passed through any state, and whenever on the line thereof the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road should be definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; that it was provided in section 6 of the said act that the president of the United States should cause the lands to be surveyed for 40 miles in width on both sides of the entire line of the road after the general route thereof was fixed, and as fast as should be required by the construction of said railroad, and that the odd sections of land thereby granted should not be liable to sale or entry or pre-emption before or after they were surveyed, except by plaintiff, as provided in said act; that plaintiff duly accepted the terms, conditions, and impositions of the act, and signified such acceptance in writing to the president of the United States; that the general route of said railroad extending through the territory of Montana was duly fixed February 21, 1872, and that the land in controversy was on and within 40 miles of the general route of said railroad so fixed as aforesaid; that on July 6, 1882, plaintiff definitely fixed the line of said road, extending opposite to and past said lands, and filed a plat thereof in the office of the commissioner of the general land office; that thereafter plaintiff duly constructed and completed that portion of said railroad and telegraph line extending on, over, and along the line of definite location of said railroad, so fixed as aforesaid, and the same was accepted by the president of the United States. It is further alleged that at the date of the definite location of said road, and of the filing of a plat thereof in the office of the commissioner of the general land office on July 6, 1882, the land was public land, to which the United States had full title, not reserved, sold, or granted, or otherwise appropriated, and free from pre-emption or other claims or rights. The material part of the amended answer is the denial of this last allegation, and the averment that on or about

the ——— day of January, 1864, one W. B. S. Higgins, being at that time a citizen of the United States over the age of 21 years, and duly qualified under the laws of the United States to make a pre-emption or homestead filing, entered into and upon the land in question, which was at that time unsurveyed, and a part of the unoccupied and unappropriated public domain of the United States; that Higgins entered upon the land for the purpose of making a home for himself, and proceeded to erect improvements upon the land, and to inclose a portion thereof with a fence; that thereafter he continued to occupy, hold, and possess the same until he sold, transferred, and assigned his interests to other parties; that through mesne conveyances the defendant herein on or about the 6th day of January, 1881, became the owner and possessor of said tract of land; that between the 1st day of July, 1862, and the date of the commencement of this action, the said land was owned, held, possessed, and occupied continuously by persons who, under the laws of the United States, were entitled to enter the same either as a homestead or pre-emption entry; that on or about the 23d day of March, 1885, the land was surveyed by the surveyor general of the state of Montana, and the survey accepted by the officers of the land department of the United States; that on or about the 25th day of March, 1885, defendant filed his declaratory statement; that on or about the 6th day of January, 1881, he settled upon said tract of land, having become the possessor thereof by purchase from the prior occupant; that thereafter he applied to the officers of the land office at Helena, Mont., to file his pre-emption on said tract of land; that the plaintiff appeared by its attorneys and agents, and contested the right of the defendant to enter the land; that the register and receiver, after hearing proof, decided that the defendant was entitled to enter the land, and that the plaintiff had no right, title, or interest therein; that thereupon the plaintiff appealed from such decision to the commissioner of the general land office, who approved the decision, and thereafter the plaintiff appealed to the secretary of the interior, who affirmed the decision of the commissioner of the land office, and decided that the defendant was entitled to hold and possess said land under the laws of the United States, and that the plaintiff had no right, title, interest, claim, or demand whatsoever in or to said lands, or any part or parcel thereof; that on the 1st day of May, 1889, the defendant filed his second declaratory statement in the land office at Helena, Mont., for the land in controversy; that this declaratory statement was accepted by the officers of the land office, and thereafter he changed it to a homestead entry, and paid the register and receiver the necessary fees therefor; that about January 1, 1891, he made application to the land office to make final proof, and, after advertisement and notice published in a newspaper, he appeared with his witnesses before the clerk of the district court for the Fourth judicial district of Montana, and proved his title to the land, and, upon presenting such proof to the register and receiver of the land office, it was accepted by them, and they issued to him a certificate showing that he was entitled to the land; that at the time of making final proof the plaintiff made no objection thereto, but allowed it to be made without protest or objection; that the proof was accepted by the commissioner of the general land office, and on the 16th day of November, 1891, the president of the United States issued to him a patent for the land, and by reason of said patent, and compliance with the laws of the United States, he is the owner and entitled to the possession of said land. To this answer the plaintiff filed a replication placing in issue substantially all the foregoing averments, except such as relate to the proceedings in the land office and the issuance of the patent. The defendant thereupon moved for a judgment upon the pleadings, upon the theory that the uncontroverted averments of the answer as to the issuance of the patent were sufficient to entitle him to a judgment. The court granted the motion. Plaintiff thereupon brought the case to this court by a writ of error. Railroad Co. v. McCormick, 19 C. C. A. 165, 72 Fed. 736. This court held that the allegations of the answer denied by the replication must be excluded from consideration in determining the issues presented by the pleadings at the time the judgment was entered in the court below, and that, as the pleadings thus stood, all the facts essential to the establishment of the plaintiff's title were alleged and were undis-

puted, save only as they were affected by the proceedings in the land office which resulted in the issuance of the patent to the defendant, and, as these proceedings were based upon an entry by the defendant made long after the title passed to the railroad company, the allegations of the answer were insufficient to sustain the judgment. The cause was accordingly remanded to the circuit court for trial upon the undetermined issues contained in the pleadings. Pursuant to this order the parties agreed upon the facts in the case, and upon such agreed facts the case was submitted to the circuit court, and a judgment was again entered in favor of the defendant. The facts agreed upon are all the facts set forth in the complaint, except the allegations "that said land was on said February 21, 1872, public land, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or right," unless the other facts agreed upon established the same, and also except the formal conclusions as to plaintiff's ownership of the land.

The material facts, as agreed upon and not previously admitted by the pleadings, are the allegations of the answer excluded from consideration at the former hearing of the case by reason of the denials in the replication. They are that at the time of the grant to the said plaintiff, and for some time prior thereto, said Higgins settled upon and occupied said land, placed improvements thereon to the amount of about $2,000, fenced a considerable portion thereof, and had raised crops of grain, oats, and wheat, and also vegetables, thereon, and was at the date of said grant a settler thereon, and an occupant duly qualified to enter said land and obtain a patent therefor; that said Higgins continued so to occupy and possess said land under his settlement thereon until some time in the year 1875, when he died, and the administrator of his estate duly sold all the right he could sell to the same and improvements thereon to one William S. Gullett, who, under his conveyance, at once took possession and occupancy of the same, and cultivated and improved the same up to May 1, 1880; that in May, 1880, said William S. Gullett sold and conveyed to defendant all the claim, right, title, and interest in said land had and held by him, and the improvements thereon, and the said defendant entered into the immediate possession and occupation thereof, settled upon and continuously farmed and improved the same, with the intention of entering and obtaining a title thereto, if so entitled under the laws of the United States; that said land was unsurveyed during all the time aforesaid, and the official survey thereof was not made until the year 1885, and the township plats were not filed until March 23, 1885; that defendant made his application to enter said land and file the necessary papers for that purpose on the 25th day of March, 1885, for the purpose of acquiring title thereto, and filed his declaratory statement in due form of law on the said 25th day of March, 1885; that a hearing of the said application to enter the same was duly ordered by the officers of the land office at Helena, Mont., and due notice of said hearing and the taking of testimony therein given to plaintiff; that plaintiff failed and neglected to appear at the taking of said testimony, and the officers of the land office at said city of Helena found in favor of the defendant; that thereupon plaintiff appealed to the commissioner of the general land office; that said commissioner decided adversely to plaintiff, and the decision of the Helena land office was thereupon affirmed; that plaintiff thereafter appealed from the decision of the said commissioner to the secretary of the interior, who confirmed the said decision; that defendant paid for said land, received a receiver's certificate therefor, and a patent was thereupon issued to him, and the same now remains in full force and effect, subject to whatever legal title plaintiff may have on account of its grant and the facts herein agreed upon; that all of the said persons, and said Higgins, the said Gullett, and the defendant, McCormick, were citizens of the United States, and duly qualified to enter said lands under the laws of the United States, and to receive a United States patent therefor; and that said McCormick was in the occupation and possession of said premises at the time of the location of the definite line of plaintiff's railroad, and the filing of the plat thereof in pursuance of the statutes of the United States in such case provided, and said facts were presented and passed upon by the officers of the land department.

C. W. Bunn, James B. Kerr, E. W. Beattie, Jr., William Wallace, Jr., William Singer, Jr., and H. G. McIntire, for plaintiff in error.

E. W. Toole and Thomas C. Bach, for defendant in error.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

MORROW, Circuit Judge, after the foregoing statements of facts, delivered the opinion of the court.

The assignments of error upon which the case is now here are ten in number, but they may all be reduced to two general propositions: (1) That the court erred in holding that the land described in the complaint was subject to homestead and pre-emption entry after the general route of the Northern Pacific Railroad was fixed on February 21, 1872; (2) that the court erred in holding that the land in controversy was subject to any claim or right on the part of the defendant on and after July 6, 1882, when the line of definite location of the road was fixed, and a plat thereof filed in the office of the commissioner of the general land office.

The act of July 2, 1864, entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific Coast, by the northern route" (13 Stat. 365), provided in section 3:

"That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, * * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

The sixth section directed the lands to be surveyed for 40 miles in width on both sides of the entire line of the road after the general route was fixed, and as fast as was required by the construction of the railroad, and provided that:

"The odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting pre-emption rights, and the acts amendatory thereof and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road, when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre, when offered for sale."

The plaintiff in error contends that when the general route of the railroad was fixed on February 21, 1872, the land in dispute,

being part of an odd-numbered section within the exterior limits of the grant, as determined by such general route, was withdrawn from sale, homestead, and pre-emption entry, under the provisions of section 6 of the granting act. It is perhaps immaterial that there is no evidence in this record that the land department at any time withdrew from sale or location, pre-emption or homestead entry, any of the public lands falling within the limits of the grant, or that a map of the lands withdrawn was ever filed with the commissioner of the general land office. Whatever withdrawal or reservation was made could only have been made under the provisions of the statute. We must therefore look to the terms of the act itself to ascertain what lands were granted to the railroad company, and declared not to be liable to sale or entry, pre-emption or homestead entry. In section 6 of the act it is provided that they are the "odd sections of land hereby granted." This clearly does not mean all sections of land designated by odd numbers within the limits of the grant, but only such sections as are granted by the act to the railroad company. Besides, this section is not to be construed without reference to other sections of the act. "It must be taken in connection with section 3, which manifestly contemplated that rights of pre-emption, or other claims or rights, might accrue or become attached to the lands granted after the general route of the road was fixed, and before the line of definite location was established." Railroad Co. v. Sanders, 166 U. S. 620. 636, 17 Sup. Ct. 676. The terms of the grant are contained in section 3, where it is provided that the land granted is every alternate section of public land, not mineral, designated by odd numbers, within the limits of the grant, "whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office." It needs no argument to show that the lands here described as excepted from the operation of the grant at the time the line of the road should be definitely fixed were never at any time granted to the railroad company, and, being expressly withheld, were as free from the terms of the grant when the general route of the road was fixed on February 21, 1872, as though they had never been within its limits. Like mineral lands, they were expressly excluded from the operation of the act.

It follows, that the first, and, indeed, the only, question to be determined is this: Was the land in controversy free from pre-emption or other claim or right on the 6th day of July, 1882? If it was, it was part of the grant to the railroad company. If it was not, the company never had title to the land, and cannot prevail in this action. In an action of ejectment, the plaintiff must recover, if at all, upon the strength of his own title, and not upon the weakness of the title claimed by his adversary. Fussell v. Gregg, 113 U. S. 550, 565, 5 Sup. Ct. 639.

It appears that the defendant entered upon this land in May, 1880, as a purchaser of the possession and improvements from the previous owner, and thereafter continuously farmed and improved

the same with the intention of entering and obtaining a title thereto, if so entitled under the laws of the United States. He was therefore a settler upon this land at the time the line of the road was definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office, on July 6, 1882. Was this settlement, under the circumstances, a "claim or right" excluding the land from the grant to the railroad? The land was at that time unsurveyed, and was not surveyed until the year 1885, and the official plat was not filed in the land office until March 23, 1885. Two days thereafter, namely, on March 25, 1885, the defendant made his application to enter the land as a pre-emptor, and thereupon filed the necessary papers for that purpose. Section 6 of the act of July 6, 1864, after providing for the survey of the lands on both sides of the Northern Pacific Railroad, provided that the odd sections granted should not be liable to sale or entry or pre-emption before or after they were surveyed, except by said company, as provided in the act. It was further provided that:

"The provisions of the act of September fourth, eighteen hundred and forty-one, granting pre-emption rights, and the acts amendatory thereof, and the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company."

This provision of the act extending the pre-emption and homestead laws to all other lands on the line of the road not granted to the company is significant, in view of the fact that these laws had already been extended to all lands belonging to the United States to which the Indian title had been, or might thereafter be, extinguished. Act June 2, 1862 (12 Stat. 413), and Act May 20, 1862 (12 Stat. 392). The only inference to be drawn from this provision is that these laws were to be continued in full force and effect, notwithstanding the grant, and to be applicable to all lands not specifically therein described as having been granted to the company. In the case of Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733, 748, the supreme court, in speaking of a grant of land made in 1863 to the state of Kansas, declared the policy of congress at that date to have been to preserve pre-emption and homestead rights until the line of the aided road should be definitely fixed. The court said:

"Formerly, lands which would probably be affected by a grant were, as soon as it was made, if not in advance of it, withdrawn from market. But experience proved that this practice retarded the settlement of the country, and at the date of this act the rule was not to withdraw them until the road should be actually located. In this way, the ordinary working of the land system was not disturbed. Private entries, pre-emption and homestead settlements, and reservations for special uses, continued within the supposed limits of the grant, the same as if it had not been made. But they ceased when the routes of the roads were definitely fixed, and if it then appeared that a part of the lands within those limits had been either sold at private entry, taken up by pre-emptors, or reserved by the United States, an equivalent was provided. The companies were allowed to select, under the direction of the secretary of the interior, in lieu of the lands disposed of in either of these ways, an equal number of odd sections nearest to those granted, and within twenty miles of the line of the road. Having thus given lands in place and by way of indemnity, congress expressly declared what the act had already implied,—that lands otherwise appropriated when it was passed were not subject to it."

These observations of the court are peculiarly applicable to the grant to the Northern Pacific Company, and in the case of Northern Pac. R. Co. v. Musser-Sauntry, L. L. & Mfg. Co., 168 U. S. 604, 610, 18 Sup. Ct. 207, this feature of the law is given as a reason why promptness on the part of the company in building its road would result to its advantage, in finding nearly all its grant within place limits.    The court said:

"At the time of the passage of the act of 1864 only in the vicinity of the proposed eastern and western termini were there any settlements. The great bulk of the territory through which the road was to pass was almost entirely unoccupied. Congress, fixing the time for commencing and for finishing the work within two and twelve years, respectively (section 8), contemplated promptness in the construction of the road, intending thereby to open this large unoccupied territory to settlement. In view of the road's traversing a comparative wilderness, it made a grant of enormous extent. Within the unoccupied territory thus to be traversed there were few settlers, and few, if any, land grants. It knew, therefore, that if the company proceeded promptly, as required, it would find within its place limits nearly the full amount of its grant."

What, then, was the effect of the settlement by the defendant upon the land in question, under the pre-emption laws?    In Whitney v. Taylor, 158 U. S. 85, 94, 15 Sup. Ct. 800, the supreme court held that the act of September 4, 1841, "gave the right of pre-emption to one making a settlement in person, and who inhabits and improves the land, and erects a dwelling thereon." The various provisions of the pre-emption act are now embraced in the Revised Statutes, and that part of section 10 which declares who are competent pre-emptors on the public lands, and what constitutes a pre-emption claim, is found in section 2259, as follows:

"Every person, being the head of a family, or widow, or single person, over the age of twenty-one years, and a citizen of the United States, or having filed a declaration of intention to become such, as required by the naturalization laws, who has made, or hereafter makes, a settlement in person on the public lands subject to pre-emption, and who inhabits and improves the same, and who has erected or shall erect a dwelling thereon, is authorized to enter with the register of the land-office for the district in which such land lies, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter-section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land."

Then follow sections in the Revised Statutes limiting the right of pre-emption, and providing the proof and the method of procedure in the land office by which that right may be established. And, where a settlement is made on unsurveyed land, the time after the survey within which the declaratory statement must be filed is prescribed in section 2266, as follows:

"In regard to settlements which are authorized upon unsurveyed lands, the pre-emption claimant shall be in all cases required to file his declaratory statement within three months from the date of the receipt at the district land-office of the approved plat of the township embracing such pre-emption settlement."

These provisions of the statute distinctly recognize that the qualified settler who enters upon and improves a tract of public land with the intention of obtaining a title thereto under the pre-emption laws is a claimant, that he has a claim to the land, and that this claim is a right of pre-emption.    This being so, it would

seem that this was one of the "claims" congress had in view when it provided that the odd-numbered sections granted to the railroad company should be free from "other claims or rights" when the definite line of the road should be fixed. Had the defendant perfected his entry of record and filed his declaratory statement in the land office prior to that time, he could then have had a preemption claim, and the land would not have been free from such claim. But congress went further, and limited the grant to lands "free from claims." As said by the supreme court in Northern Pac. R. Co. v. Musser-Sauntry L. L. & Mfg. Co., supra:

"No one can read this entire description without being impressed with the fact that congress meant that only such lands should pass to the Northern Pacific as were public lands, in the fullest sense of the term, and free from all reservations and appropriations, and all rights or claims in behalf of any individual or corporation, at the time of the definite location of its road."

But we are not without direct authority upon this question. In Railroad Co. v. Sanders, 166 U. S. 620, 17 Sup. Ct. 671, this same grant was before the court. After the general route of the road was fixed, February 21, 1872, and prior to the establishment of its line of definite location, July 6, 1882, certain persons, qualified to enter mineral lands under the laws of the United States, entered upon the possession of lands within the exterior lines of both the general and definite routes of the railroad, and made claim to such lands. These claims were pending when the definite line of the road was fixed. The defendants, who subsequently entered into the possession of the land, did not assert title in themselves, but resisted the claim of the railroad company upon the ground that the land was excluded from its grant by reason of the fact that there were claims to the land at the time of the location of the road. The claims consisted, as stated, in the application of certain parties to purchase the land as mineral land. The land was not in fact mineral land, and it does not appear what became of the applications. They were presented merely as claims, without any other fact or circumstance tending to establish their connection with any right of title, and did not in any way relate to the defendants' right of possession of the land. The court, in commenting upon this feature of the case, said:

"But it is said that no account is to be taken of those applications, for the reason that the present defendants, who had nothing to do with them, and had no interest in them, confess in their answer that the lands in question 'did not contain gold or other precious metals in paying quantities, or in such quantity as to make the same, or any part thereof, commercially valuable therefor'; that the lands are therefore to be regarded as agricultural lands that passed to the company under the act of 1864, and were preserved to it by the filing of the map of the general route in 1872, and by their withdrawal in that year by the general land office 'from sale or location, pre-emption or homestead entry.' This view overlooks the fact that the express declaration of congress was that no public lands should pass to the company, to which, at the time of the definite location of the road, the United States did not have title free from preemption 'or other claims or rights.' If the applications made in 1880 and 1881 to purchase different parts of the section in question, and which were pending and undisposed of in 1882, when the company filed its map of definite location, constituted 'claims,' within the meaning of the act of 1864, then it was not competent for the defendants, by any admission they might make, for what-

ever purpose made, as to the quality of these lands,—whether mineral or not,—to eliminate from the case the essential fact that these 'claims' existed of record when the line of the road was definitely located. Indeed, if it now appeared that the land office finally adjudged, after the definite location of the road, that the lands embraced by those applications were not mineral, they could not be held to have passed to the railroad company under the act of 1864, for the reason that they were not, at the time of such definite location, free from pre-emption or 'other claims or rights.' "

In another part of the opinion the court says:

"As the lands in question were not free from those claims at the time the plaintiff definitely located its line of road, it is of no consequence what disposition was or has been made of the claims subsequent to that date."

The court accordingly held that the lands did not pass to the railroad company by the terms of its grant, for the reason that claims to the land were pending at the time of the definite location of the road.

The only distinction to be drawn between this case and the one at bar is the fact that, in the case referred to, the applications to purchase the land as mineral land were on file in the land office when the line of definite location of the road was fixed, while in the present case, although the defendant had settled upon the land, he had not at that time filed his declaratory statement; but, as we have seen, this was not necessary under the statute, for the reason that the land was unsurveyed public land. As soon as it had been surveyed, and the plat of the township embracing the settlement was received at the district land office, the defendant filed his declaratory statement, as required by section 2266 of the Revised Statutes. What more could he do? He had not only settled upon the land before the line of the railroad was definitely fixed, but he continued to occupy, cultivate, and improve the land until his claim was established by law, and a patent issued to him thereon, on the 16th day of November, 1891. The action of the land department in issuing a patent to the defendant may be of itself immaterial in this case, but, in the proceedings in the land office resulting in the patent being issued, the fact of settlement upon the land by the defendant as a qualified settler under the law was found, and found by competent authority. It was also found that whatever right or claim the defendant had was based upon this settlement. In other words, the pivotal fact was established that a claim to this land, whatever that claim might be in law, existed on July 6, 1882. Catholic Bishop of Nesqually v. Gibbon, 158 U. S. 155, 166, 15 Sup. Ct. 779.

In Railroad Co. v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, the court declared the law to be that no pre-emption or homestead claim attaches to a tract of land until an entry in the local land office, and the plaintiff in error relies upon this case as excluding defendant's claim. But the facts in that case did not require the court to determine the effect of a settlement upon public land by a qualified settler, followed by a pre-emption entry within the time prescribed by law; and the court expressly stated that it deemed it unwise to make any observations concerning matters not considered by the supreme court of the state from which the case had been taken upon

a writ of error. The case of Railroad Co. v. Groeck, 31 C. C. A. 334, 87 Fed. 970, recently decided by this court, is also relied upon by the plaintiff in error as establishing the doctrine that the lands in question were withdrawn by the operation of section 6 when the general route of the road was fixed, February 21, 1872, and were thereafter excepted from homestead and pre-emption entry. The act involved in that case was the act of July 27, 1866, granting lands to aid in the construction of the Atlantic & Pacific and the Southern Pacific Railroads. 14 Stat. 292. Section 6 of that act is identical with section 6 of the act granting lands to the Northern Pacific, but section 3 of the former act differs very materially from the latter act, in fixing the time when the grant of specific lands should attach. It provides that there is granted every alternate section of public land, not mineral, designated by odd numbers, wherever on the line of the road the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, "at the time the line of said road is designated by a plat thereof filed in the office of the commissioner of the general land office." This plat was filed January 3, 1867, and under the terms of the act the grant at that time attached to the odd-numbered sections not subject to the reservations, claims, and rights mentioned in the act. The defendant, Groeck, did not settle upon the land claimed by him until September 2, 1885, or more than 17 years after the right of the railroad to specific sections had been fixed by law. His pre-emption entry was, however, accepted by the land department, and a patent for the land issued to him, because the withdrawal of the land from settlement by the secretary of the interior for the benefit of the railroad had been revoked on August 15, 1887. This court held that the granting act itself operated to withdraw from settlement the lands lying within the limits of the grant from the date of the filing of the map of the general route, and this determination was in accordance with the express terms of the act. Manifestly, the law of that case has no bearing upon the case now before the court. The sections of the act we have had under consideration differ very materially from the provisions of other acts granting lands in aid of public improvements, and decisions in cases based upon such different provisions cannot be followed as authority in this case, without noticing the distinction; and, as the views here expressed are believed to be entirely in accord with the latest decisions of the supreme court upon the questions involved, it is not deemed necessary to discuss the other cases cited in the briefs.

It follows from what has been said that we are of the opinion the land in controversy was subject to homestead and pre-emption entry after the general route of the Northern Pacific Railroad was fixed, on February 21, 1872, and that it was not free from the claim of the defendant when the line of the road was definitely fixed, on July 6, 1882. The latter determination necessarily disposes of the case. The judgment of the court below will be affirmed.

GILBERT, Circuit Judge (dissenting). I am unable to concur in the view that the supreme court has by its decisions in Railroad Co.

v. Sanders, 166 U. S. 620, 17 Sup. Ct. 671, and Northern Pac. R. Co. v. Musser-Sauntry L. L. & Mfg. Co., 168 U. S. 604, 18 Sup. Ct. 205, overruled a series of prior decisions in which it was uniformly held that the withdrawal of lands within the grant to the Northern Pacific Railroad Company upon the filing of its map of the general route of its road operated to exclude the withdrawn lands from subsequent settlement by individuals under the homestead and pre-emption law . That such was the effect of the withdrawal has been distinctly and repeatedly announced. In Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. 100, referring to the grant to the Northern Pacific Railroad Company, the court said:

"But it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or pre-emption of the adjoining odd sections within forty miles on each side, until the definite location is made. * * * When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land office, or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain: It is to preserve the land for the company to which, in aid of the construction of the road, it is granted."

In that case a settler had upon October 5, 1871, entered upon land, with the intention of securing a pre-emption claim. The land was then within the limits of an Indian reservation, the Indian title to which was not extinguished until June 19, 1873. On August 11, 1873, and within three months after the government survey of the land, the pre-emptioner presented his declaratory statement. On February 21, 1872, the map of the general route of the road had been filed, and on March 30, 1872, the withdrawal was made. Speaking of notice of the withdrawal, the court said:

"This notification did not add to the force of the act itself, but it gave notice to all parties seeking to make a pre-emption settlement that lands within certain defined limits might be appropriated for the road. At that time the lands were subject to the Indian title. The defendant could not, therefore, as already stated, have then initiated any pre-emption right by his settlement, and the law cut him off from any subsequent pre-emption. The withdrawal of the odd sections mentioned from sale or pre-emption, by the sixth section of the act, after the general route of the road was fixed, in the manner stated, was never annulled. It follows that the defendant could never afterwards acquire any rights against the company by his settlement."

In St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389, concerning the withdrawal of lands by the secretary of the interior, the court said:

"His action in formally announcing their withdrawal was only giving publicity to what the law itself declared. The object of the withdrawal was to preserve the land unincumbered until the completion and acceptance of the road. * * * After such withdrawal, no interest in the lands granted can be acquired, against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route is fixed."

In U. S. v. Southern Pac. R. Co., 146 U. S. 570, 599, 13 Sup. Ct. 152, the court expressly approved the language above quoted from the opinion in Buttz v. Railroad Co. In Hamblin v. Land Co., 147 U. S. 531, 13 Sup. Ct. 353, it was held that a withdrawal of lands as

coming within the limits of a railroad grant operates to withdraw the lands. from homestead entries, even if found afterwards not to come within such limits. In Maddox v. Burnham, 156 U. S. 544, 15 Sup. Ct. 448, it was held that the mere occupation of public land for the purpose of subsequently entering the same for a homestead, but without making such entry until after a withdrawal had been ordered by the secretary of the interior, gave the occupant no right thereafter to obtain title under the homestead laws.

The case of Railroad Co. v. Sanders, it is said, declares a doctrine at variance with the former decisions of the court. What was actually decided by the court in that case was that the withdrawal of lands consequent upon fixing the general route of the road did not operate to withdraw mineral land, and that if at the time of fixing the definite location of the road there was pending an application to purchase any of the granted lands, upon the ground that it was mineral land, such application constituted a "claim" against the land which excluded it from the grant, notwithstanding the fact that it was subsequently proven that the land was not in fact mineral land. That decision rests upon grounds which have no application in the present case. All mineral lands were withheld from the grant to the railroad company. The withdrawal could not affect lands not within the grant. Such lands, after withdrawal, as before, were open to claim and purchase as mineral lands. The difference between an application to purchase mineral lands, and a pre-emption entry after a withdrawal, is that in the one case the law authorized and invited the application to purchase, while in the other it strictly prohibited all steps towards obtaining title, and declared that such unauthorized settlement could not become the basis of a claim. It is true that in the course of the opinion in the Sanders Case the court remarked that section 3 of the grant to the railroad company "manifestly contemplated that rights of pre-emption or other claims and rights might accrue or become attached to the lands granted after the general route of the road was fixed, and before the line of definite location was established," but the case presented no question of pre-emption right. It is not conceivable that the court intended by the use of those words in the opinion to deliberately overrule the plain doctrine of its decisions in the cases above referred to. I think that the language so quoted must be considered only in its connection with the question which was then before the court for decision. In Northern Pac. R. Co. v. Musser-Sauntry L. L. & Mfg. Co., the court, in concluding its opinion, declared that the only point intended to be decided was "that when a withdrawal of lands within indemnity limits is made in aid of an earlier land grant, and made prior to the filing of the map of definite location by a company having a later grant,—the latter having such words of exception and limitation as are found in the grant to the plaintiff,—it operates to except the withdrawn lands from the scope of such later grant." The court ruled in that case, as it had ruled before, that the grant of lands to the Northern Pacific Railroad Company under the third section of the

grant conveyed, so far as the United States were concerned, only the lands within the grant to which the United States should have "full title, not reserved, sold, granted or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office," and that the United States retained the right at any time prior to the date of fixing such definite line to make a legislative grant of the lands in aid of another railroad, or for any other purpose; but the court, in its opinion in that case, again defined the office and function of a withdrawal, and said:

"The withdrawal by the secretary in aid of the grant to the state of Wisconsin was valid, and operated to withdraw the odd-numbered sections within its limits from disposal by the land officers of the government under the general land laws. The act of the secretary was, in effect, a reservation."

Conceding that the decision in that case reaffirms the doctrine that congress might by legislation retract from the grant any of the odd-numbered sections within the limits thereof, and might, even after the general route was fixed and the lands were withdrawn, have offered the same to settlers under the pre-emption and homestead laws, the fact remains that no such action has been had, and no such legislation has been enacted. In section 6 of the granting act to the Northern Pacific Railroad Company, after granting the odd-numbered sections, it is expressly declared that the pre-emption and homestead laws shall be extended to the other lands. No subsequent legislation has indicated the purpose of congress to extend those laws to lands within the grant, other than those so indicated. In Menotti v. Dillon, 167 U. S. 703, 17 Sup. Ct. 945, the court made a similar ruling in reference to the grant to the Central Pacific Railroad Company. The court said:

"The right it acquired, in virtue of the act making the grant and of the accepted map of its general route, was to earn such of the lands, within the exterior lines of that route, as were not sold, reserved, or disposed of, or to which no pre-emption or homestead claim had attached, at the time of the definite location of its road."

And, in speaking of the order of withdrawal, said:

"That order took these lands out of the public domain, as between the railroad company and individuals; but they remained public lands, under the full control of congress, to be disposed of by it in its discretion at any time before they became the property of the company under an accepted definite location of its road."

The purpose of the withdrawal, as has been often declared by the supreme court, was to protect the grant. What protection would be afforded by a withdrawal which left the withdrawn lands in the same position as other lands of the public domain? The construction which is adopted by the majority of the court in this case renders the withdrawal an idle and meaningless act. If it is the true construction, the grant to the railroad company might have been entirely defeated by entries in the land office prior to the date of definite location of the road. It is true that in the case of Northern Pac. R. Co. v. Musser-Sauntry L. L. & Mfg. Co.

the court, while maintaining the right of congress at any time prior to the definite location to withdraw the granted lands and bestow them in aid of another road, answered the argument that such a construction might operate to defeat the entire grant by referring to the presumption that congress "acted and would act in good faith," and without intent to deplete the grant by subsequent legislation, or, in other words, declared that, while congress had the power to deplete the grant, it might be relied upon not to exercise the power. But can any such presumption arise in favor of the protection of a land grant as against the entry of individual settlers under the homestead and pre-emption laws? May they be relied upon to act in good faith, and with due regard for the rights of the railroad company and the intention of congress? In the sentence above quoted from the opinion in Menotti v. Dillon, "That order took these lands out of the public domain, as between the railroad company and individuals," is contained, in brief, the rule of law which is established by the decisions, and by which the present question should be governed. Lands so withdrawn are reserved from settlement by pre-emptors. So far as the settler is concerned, they are no longer within the public domain, or, as was said in Northern Pac. R. Co. v. Musser-Sauntry L. L. & Mfg. Co., "The act of the secretary was, in effect, a reservation." These utterances of the supreme court, which are subsequent in time to the decision in the Sanders Case, manifest the purpose of the court to adhere to its settled definition of the office and effect of a withdrawal,—a definition which can have but one meaning. If such is the true construction of the grant, a pre-emption entry, the initial step of which was taken subsequent to the withdrawal, cannot avail to except the land from the grant.