THE UNION PACIFIC RAILROAD COMPANY V. MORRIS
HARRIS *et al.**

No. 15,115.   (91 Pac. 68.)

SYLLABUS BY THE COURT.

PUBLIC LANDS—*Preemption and Settlement—Grant for a Rail-
road Right of Way.*   A tract of land owned by the United
States, but lawfully occupied by a settler who had filed a
declaratory statement claiming a right to it under the pre-
emption law, was not a part of the "public lands" within the
meaning of section 2 of the act of congress of July 1, 1862
(12 U. S. Stat. at L. p. 489), giving to certain railroad com-
panies a right of way through the public lands, and no right
with respect to such tract was thereby granted.

Error from Saline district court; ROLLIN R. REES,
judge.   Opinion filed July 5, 1907.   Affirmed.

*N. H. Loomis, R. W. Blair,* and *H. A. Scandrett,* for
plaintiff in error.

*Z. C. Millikin,* for defendants in error.

The opinion of the court was delivered by

MASON, J.: On April 22, 1861, Bernhard Blou set-
tled upon a quarter-section of "unoffered" government
land, and on May 13 in the same year he filed a de-
claratory statement claiming a right thereto under the
preemption law. He remained continuously in posses-
sion, but on September 5, 1865, he entered the land as
a homestead. He proved it up as such December 8,
1870, receiving a patent March 15, 1872.

On July 1, 1862, congress passed an act (12 U. S.
Stat. at L. p. 489) incorporating the Union Pacific
Railroad Company, and giving to it and to the Leaven-
worth, Pawnee & Western Railroad Company, a Kan-
sas corporation, a right of way 400 feet wide over "the
public lands" for the construction of a railroad within
certain limits and upon certain conditions.   In con-

*Pending in the supreme court of the United States on a writ of error
allowed August 16, 1907.

formity with this act and the amendments thereto a road was built by the Kansas company across the land above described prior to May 4, 1867. On January 20, 1873, Blou made the company a deed for a right of way lying fifty feet on each side of its track. Thereafter Blou's title to the land south of the track passed to Morris Harris and others, and the Union Pacific Railroad Company succeeded to all the rights of the Kansas corporation. In August, 1902, the company placed a fence on the land 200 feet south of the track and parallel to it, and began the construction of side-tracks and yards on the strip so enclosed. Harris and his associates brought ejectment for all of the strip except the fifty feet next to the track and recovered judgment, from which the defendant prosecutes error.

The railroad company has no title unless it obtained one by the following grant made to the Union Pacific company by section 2 of the act referred to, and extended to the Leavenworth company by section 9:

"That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; and the right, power, and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine-shops, switches, side-tracks, turntables, and water stations. The United States shall extinguish as rapidly as may be the Indian titles to all lands falling under the operation of this act and required for the said right of way and grants hereinafter made." (12 U. S. Stat. at L. p. 491.)

A claimant under the preemption law acquired no vested right in the land he occupied until he had fully complied with the law, paid the purchase-money, and become entitled to a patent. (26 A. & E. Encycl. of L. 232.) Therefore congress had the unquestioned power

in 1862 to grant a right of way across the quarter-section upon which Blou had settled, notwithstanding his occupancy was lawful and in connection with his filing insured him a preference when the land should be offered for sale. The question is whether the statute quoted is to be interpreted as evidencing an intention to do so. And this depends upon whether the phrase "public lands" was therein employed in such a sense as to make it inclusive of tracts in the situation of that occupied by Blou. In construing railroad land grants the words "public lands" are treated, not as designating all lands which are public in the sense that the government owns them and technically speaking may dispose of them as it sees fit, but as excluding at least every tract to which an individual has acquired under the settlement laws a valid claim that may ultimately ripen into a title, although no vested right has accrued to him at the time. This rule of construction has been definitely adopted by the federal supreme court. Thus, in *Bardon v. Northern Pacific Railroad,* 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806, it was said:

"It is thus seen that when the grant to the Northern Pacific Railroad Company was made, on the 2d of July, 1864, the premises in controversy had been taken up on the preemption claim of Robinson, and that the preemption entry made was uncanceled; that by such preemption entry the land was not at the time a part of the public lands; and that no interest therein passed to that company. The grant is of alternate sections of public land, and by public land, as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land to which any claims or rights of others have attached does not fall within the designation of public land." (Page 538.)

And in *Northern Pacific Railway v. De Lacey,* 174 U. S. 622, 19 Sup. Ct. 791, 43 L. Ed. 1111: "If there had been a preemption claim at the time of the passage of the act of 1864, the land would not have passed under that grant." (Page 626.) Of this expression

17—76 KAN.

it was said in *United States v. Oregon & C. R. Co.,* 143 Fed. 765, 75 C. C. A. 66:

"We think the clause last quoted is in precise accord with the numerous decisions of the same court to the effect that no land is 'public land,' within the meaning of such grants, to which there is at the time of the making thereof a live claim on the part of an individual under the homestead or preemption law, which has been recognized by the officers of the government, and has not ceased to be an existing claim." (Page 771.)

See, also, 6 Words & Phrases Jud. Def. 5793; *B. K. & S. W. Rld. Co. v. Johnson,* 38 Kan. 142, 150, 16 Pac. 125; *Hastings etc. Railroad Co. v. Whitney,* 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; *United States v. Union Pac. Ry. Co.,* 61 Fed. 143; *United States v. Turner,* 54 Fed. 228; *Whitney v. Taylor,* 158 U. S. 85, 15 Sup. Ct. 796, 39 L. Ed. 906; and *Northern Lumber Co. v. O'Brien,* 204 U. S. 190, 27 Sup. Ct. 249, 51 L. Ed. 438, affirming the same case in 139 Fed. 614, 71 C. C. A. 598, where it was said:

"The words 'public land' have long had a settled meaning in the legislation of congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made." (Syllabus.)

But it is insisted that a different rule should obtain here, because the statute quoted grants a mere right of way. Such a grant, however, differs only in degree—not in kind—from a grant of land. Even although it may not in strictness carry the fee to the strip designated, its practical operation is the same as though it did; the right it confers is much greater than an ordinary easement. (26 A. & E. Encycl. of L. 336, ¶ 9.) It is true that land is ordinarily made more valuable by proximity to a railroad, and in a particular case the owner or prospective owner of a tract may be benefited rather than injured by the building of a road

directly across it. But it cannot be said that a right of occupancy is not to some extent invaded by such an act if done without compensation, or that the practical injurious effect of such invasion is necessarily slight and unsubstantial. It is noticeable that congress has often explicitly recognized the moral right of the settler to be protected in this respect, and so far as our observation goes has never explicitly ignored it.

Nevertheless there is so great a difference between the entire loss of all claim to a tract and the yielding up to a railroad of a right of way across it that it might not be unreasonable to suppose that congress, having the power to impose either hardship upon the settler, was willing to compel him to bear the less but not the greater. If the Bardon case had been decided merely upon a presumption that congress did not intend that settlers should lose their lands the argument might well be made that the rule it announced does not apply where only a right of way is involved. But that case was not controlled solely by that consideration. If it had been the grant would have been held to relate to, and to be inclusive of, the lands already settled upon, but to be made in subjection to the prior rights of the settlers. And in any given instance where a filing had been in force at the time the act was passed, but had been canceled before the road was definitely located, the right of the settler being thus disposed of, a complete title would have been held to have vested in the company when the conditions of the grant were met. But in the Bardon case it was decided that the grant did not pass title to a tract which was burdened with a preemption filing at the date of the enactment, notwithstanding its subsequent cancelation. This result was reached by so defining "public lands" as to exclude all lands to which individual interests had attached. In the opinion it was further said:

"As the land preempted then stood on the records of the land department, it was severed from the mass

of the public lands, and the subsequent cancelation of the preemption entry did not restore it to the public domain so as to bring it under the operation of previous legislation, which applied at the time to land then public. The cancelation only brought it within the category of public land in reference to future legislation. This, as we think, has long been the settled doctrine of this court. . . . Three justices, of whom the writer of this opinion was one, dissented from the majority of the court in the Leavenworth case; but the decision has been uniformly adhered to since its announcement, and this writer, after a much larger experience in the consideration of public-land grants since that time, now readily concedes that the rule of construction adopted, that, in the absence of any express provision indicating otherwise, a grant of public lands only applies to lands which are at the time free from existing claims, is better and safer, both to the government and to private parties, than the rule which would pass the property subject to the liens and claims of others." (145 U. S. pp. 539, 543.)

While the phrase "public lands" is capable of a variety of meanings, and may be variously employed in different statutes, the presumption is reasonable that where used in a similar connection in contiguous sections of the same act it is intended to have the same force. Section 3 of the act of 1862 reads:

"And be it further enacted, that there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached, at the time the line of said road is definitely fixed; provided, that all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company. And all such lands, so granted by this

Railroad Co. v. Harris.

section, which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and preemption, like other lands, at a price not exceeding one dollar and twenty-five cents per acre, to be paid to said company." (12 U. S. Stat. at L. p. 492.)

This language is not essentially different, so far as concerns the question under consideration, from that interpreted in the Bardon case, which is as follows:

"That there be, and hereby is, granted to the 'Northern Pacific Railroad Company,' its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title; not reserved, sold, granted or otherwise appropriated, and free from preemption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land-office." (13 U. S. Stat. at L. p. 367.)

Manifestly, therefore, in the act of 1862 the section following that by which the right of way is granted uses the term "public lands" as excluding tracts occupied by settlers. It refers to lands to which preemption or homestead claims have attached, not as forming a separate class of public lands, but as lands which have been withdrawn from that category—have ceased to be public lands—by the fact of such claims having attached. Two conditions were necessary in order that land should pass by the grant there contained: it must have been free from preemption or other filing when the act was passed or the act would not have applied to it, because it would not have been public land at that

time; and it must have remained in that condition until the line of the railroad was definitely fixed, because a filing prior to that time would have taken it out of the operation of the act by bringing it within the exception there stated. This is necessarily the interpretation that results from the decisions cited. By attributing the same meaning to the expression "public lands" as used in section 2 a harmonious and consistent construction is reached. The right of way was granted upon but one condition—that the land should be public at the time the act was passed. The grant took effect at once upon all lands that were then public—that is, unoccupied. Any that were then occupied were not public and were not affected. Any that were then vacant but were filed upon later were taken in subjection to the right of way. Thus, in *Railroad Co. v. Baldwin,* 103 U. S. 426, 26 L. Ed. 578, it was said:

"The act . . . makes two distinct grants: one of lands . . . the other of a right of way. . . . The lands consisted of alternate sections, designated by odd numbers, on each side of the line of the proposed road. The grant of them was subject to the condition that if, at the time the line of the road was definitely fixed, the United States had sold any section or a part thereof, or the right of preemption or homestead settlement had attached to it, or the same had been otherwise reserved by the United States for any purpose, the secretary of the interior should select an equal quantity of other lands nearest the sections designated, in lieu of those appropriated, . . . but the grant of the right of way . . . contains no reservations or exceptions. It is a present absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designated." (Pages 428, 429.)

It seems clear that this is the construction placed upon the act of 1862 by the ensuing congress. The original act made no provision for condemnation proceedings. But in 1864 it was amended (13 U. S. Stat. at L. pp. 356, 357) by adding a provision for the exer-

cise of the right of eminent domain and for the compensation not only of "owners" but also of "claimants" of land taken. The word "claimants" had obvious reference to occupants under the homestead or preemption laws (*W. P. R. R. Co. v. Tevis,* 41 Cal. 489, 494; *Northern Pac. Ry. Co. v. M'Cormick,* 94 Fed. 932, 36 C. C. A. 560; *Nelson v. Northern Pacific Railway,* 188 U. S. 108, 23 Sup. Ct. 307, 47 L. Ed. 406), and must have been intended to apply to occupants of lands filed upon before the first enactment, for, as already pointed out, those filed upon afterward were taken subject to the right of way thereby granted.

It follows from this view that the judgment of the trial court must be affirmed, on the theory that section 2 of the act of 1862 granted no right of way over the Blou tract, because it was not at the time "public land" within the meaning of the term as there used. We think this conclusion is not inconsistent with any controlling decision. Expressions are used in a number of cases to the effect that a difference is to be recognized between the grant of land and the grant of a right of way, but for the most part they relate to differences made by the statutes in express terms or by necessary implication, and have no direct bearing upon the question here involved. In two instances this very act explicitly makes such a distinction. It makes two exceptions with respect to the grant of aid lands which do not apply to the grant of the right of way: one in favor of claims to be acquired before the definite location of the line of railroad, and the other in favor of reservations already made to the United States for any purpose, such as for the use of an Indian tribe under a treaty. (*Leavenworth, etc., R. R. Co. v. U. S.,* 92 U. S. 733, 746, 23 L. Ed. 634.) That the framers of the statute deemed it necessary to mention these differences in set terms militates against the suggestion that by mere implication growing out of the nature of the privilege given the words "public lands," when used in connection with the grant of a strip of ground

for the use of a railroad, are to be given a different meaning from that attached to them when applied to the grant of land to aid in its construction.

In the opinion in *Union Pac. Ry. Co. v. Douglas Co.,* 31 Fed. 540, it was said that congress intended by the act of 1862 that a right of way should be given through all lands over which it had control, but the statement was broader than the occasion required. There the question presented was the right of the railroad company to occupy a right of way across school sections, and was determined upon a variety of considerations, not all of which are here applicable.

The case of *Northern Pacific Railroad Co. v. Smith,* 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157, the authority of which the plaintiff in error invokes, turned upon exceptional circumstances. A 400-foot right of way over public lands was granted to the railroad company in 1864. It adopted a definite route, which was accepted by the government in 1873. But in 1872 it actually constructed its road along a somewhat different route, which also was afterward approved, or at least acquiesced in, by the federal authorities. The road as so constructed crossed a town site which had already been occupied but no plat of which had then been filed in the register's office. Such occupancy did not date back to 1864. In 1879 a patent of the town site was made to the town company, and thereafter Smith received a conveyance from the town company for lots lying within 200 feet of the track. He brought ejectment against the railroad company, whose title was ultimately sustained. It is evident that unless the railroad company lost some rights under the statute by its change of route its title antedated Smith's. The land was unquestionably public land when the act was passed. If, however, it did lose priority thereby, the entire situation was changed, and the determination of the rights of the parties under such circumstances would not necessarily affect the present case. Indeed, the decision involved so many different con-

siderations that it is difficult to evolve from it a principle of general application.

In *Jamestown & Northern Rd. Co. v. Jones,* 177 U. S. 125, 20 Sup. Ct. 568, 44 L. Ed. 698, a different statute was considered—the general act (18 U. S. Stat. at L. p. 482) granting a right of way over public lands to any corporation upon certain conditions. In the federal court the only question discussed related to the time the grant took effect—whether upon the construction of the road or the filing of a map. In the state court, however (7 N. Dak. 619, 76 N. W. 227), it was held that although a grant was prevented from taking effect at once as to a particular tract by the existence of a preemption filing thereon it would become operative upon the cancelation of that filing. This holding is supported by reasoning not applicable to the statute here involved. The act of 1875 is prospective. It makes no present grant. It rather affords a means by which a right of way may be acquired than grants one. It expressly recognizes and protects the interest of the settler who has acquired no vested right. Moreover, by the use of the phrase "possessory claims on the public lands of the United States" in section 3, there is a recognition that the term "public lands" is there employed in its broader sense.

The supreme court of Utah has recently decided against the contention of the railroad company a question entirely similar to that here presented. (*Oregon Short Line R. R. Co. v. Fisher, et al.,* 26 Utah, 179, 72 Pac. 931.)

The judgment is affirmed.